Filed 4/9/15  Certified for partial publication 5/6/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the Marriage of PENNY and THOMAS MITCHELL HONER. | |
| PENNY HONER,<br><br>        Appellant,<br><br>v.<br><br>THOMAS MITCHELL HONER,<br><br>        Respondent. | A137961<br><br>(Mendocino County Super. Ct.<br>No. SCUK CVFL - 09 54651) |

At issue in this dissolution of a 27-year marriage are issues of division of community property and spousal support.  Appellant ex-wife questions the court's valuation of the couple's two grocery stores because (1) it purportedly used the wrong valuation date, (2) it relied on an expert who used the "marital value" of the properties rather than the "investment value," and (3) it denied her posttrial motion to reopen the evidence to update the property valuation.  She further contests the amount of spousal support she was awarded, arguing the court (1) failed to properly determine her ex-husband's ability to pay, (2) failed to consider the parties' financial disparity, and (3) granted her an "illusory" award of a percentage of the ex-husband's future distributions from the family business.  Finally, she contends the overall distribution of property was not equitable and meaningful.  She asks us to reverse the judgment and order the matter retried before a different judge.  We find no basis for reversal and affirm.

1

# I.  BACKGROUND

Thomas (Tom) and Penny Honer (Penny) were married in 1982 and separated in 2009.  During their long marriage, Tom and Penny[1] together purchased and built up several grocery stores, two of which remained primary marital assets at the time of their separation:  Harvest Market in Fort Bragg and Harvest Market at Mendosa's in Mendocino (Mendosa's).  The Honers opened Harvest Market in 1985 and acquired Mendosa's in 2006.  The businesses were held by Cypress Holdings, Inc. (Cypress Holdings), an S corporation.  Tom was and is president and CEO of Cypress Holdings and Penny was Vice President.

The Honers' markets found success by specializing in an upscale niche for specialty foods and natural and organic products.  Tom managed the grocery stores, while Penny designed the logo, decorated the markets, and took care of administrative tasks, such as payroll, billing, advertising, employee training, and customer relations.  She also computerized their operations and participated in entertaining business contacts.

Cypress Holdings paid Tom a base salary of $260,000 per year for his work in the markets, and he also earned $18,600 as a director of a bank.  Penny did not draw a salary from the business, but beginning January 1, 2010 (after separation) she was paid $6,500 per month as a director.  Tom was 64 at the time of trial, in good health, and worked fulltime.  He testified he intended to work until age 70.  At that time, he hoped to pass the markets on to his daughter and her husband.

After 1997, Penny, who was 58 at the time of trial, was less involved with the stores.  From 2002 to 2009, she taught elementary school, while continuing to remain peripherally involved in the grocery business.  In 2009 she was diagnosed with multiple sclerosis and has not worked since.  Her disease is progressive and may be expected to worsen over time.

The couple historically used profits from the grocery stores, rather than borrowed funds, to invest in capital expenditures.  Though Penny insists they lived below their

[1] Because the parties share the same last name, we refer to them by their first names for ease of reference.  In doing so, we mean no disrespect.

2

means, they were still able to maintain a comfortable lifestyle, which the court characterized as "upper class" and "very nice." They owned and lived on a 52-acre ranch on Gordon Lane in Mendocino, which included a 3,070 square-foot home, a two-bedroom apartment, six horses and stables, a paddock, and a two-acre pond. They purchased the ranch in 2002 for $1.85 million.

The Honers also used business profits to invest in other real estate holdings through Spring Pond, LLC (Spring Pond), of which Tom and Penny were equal co-owners and Tom was the managing member. In 2006, Spring Pond bought the building in which Mendosa's was housed, and in 2010 added a hardware store to the grocery operations. Also in 2006, Spring Pond bought another building in Mendocino, known as Paddleford House, which since 2009 or 2010 has housed a veterinary clinic. In 2011, Mendosa's added a pharmacy run by a separate individual who paid rent to Cypress Holdings.

Spring Pond collected rent from Mendosa's at the rate of $7,170.15 per week and rent of $2,560 per month from the veterinary clinic at Paddleford House ($2,000 after expenses). Spring Pond received $332,618 in rent in 2009 and $390,730 in 2010. Because of the renovations to the properties in 2010, Spring Pond showed net earnings of only $8,212 in that year.

In 2009, Spring Pond purchased an acre of undeveloped land known as the Art Center for $600,000, with interest payments monthly and principal payable at $100,000 per year for six years. There was testimony that it might be possible to develop the Art Center property with a small housing complex (four to nine units), which could provide future income.

Due to the debt on the property and depressed real estate values, the Honers' equity in the ranch was only $137,832 at the time of trial (the house and ranch being valued at $1.01 million). After the separation, Tom continued to live on the ranch, while Penny moved to Dallas, Texas to care for her ailing mother. Penny paid $3,800 per month for a two-bedroom apartment in Dallas.

Penny filed for divorce in September 2009. Trial was held before the Honorable Cindee Mayfield in December 2011 and January 2012. On April 19, 2012, the court filed its statement of decision on the property division and spousal support issues, having bifurcated issues relating to attorney fees and costs.

In addition to the major assets identified above, the couple owned several retirement funds and other assets, making their total net worth $6,667,040, with the assets being divided by the court as follows:

Awarded to Tom:

a. Cypress Holdings ($3,180,000)

b. 10501 Lansing Street (housing Mendosa's) (stipulated to be worth $4,072,500, with $1,687,364 in equity)

c. Gordon Lane (marital residence) ($1,010,000 with $137,832 in equity)

d. Two Cypress Holdings Profit Sharing plans (total value $424,185, of which $207,539 was awarded to Tom)

Total awarded to Tom after credits and charges:[2] $4,909,712

Awarded to Penny:

a. Paddleford House ($375,000, no debt)

b. Art Center ($385,000 with $185,000 equity)

c. Life insurance policy ($180,949)

d. Three American Funds 401(k) accounts ($430,250)

e. Two Cypress Holdings Profit Sharing plans (total value $424,185, of which $216,647 was awarded to Penny)

f. Four IRA's ($60,319)

Total awarded to Penny (including minor assets and distributions during separation): $1,757,329

---

[2] *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 82–83 [credits]; *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 372–374 [charges].

In addition, Tom was ordered to pay Penny an equalizing payment of $1,576,192 within 90 days after judgment. It was understood that Tom would have to borrow "most or all" of the money to make the equalizing payment. And finally, the court ordered that Penny be paid 20 percent of any distributions made to Tom out of Cypress Holdings beyond his base salary of $260,000 annually. When the equalizing payment is considered (i.e., deducted from Tom's award and added to Penny's), Penny's total award was $3,333,521 and Tom's award was $3,333,520.

On September 10, 2012, Penny moved to reopen the evidence to allow updated Cypress Holdings financial statements to be taken into account in dividing the community property. Specifically, Penny claimed the profits of Cypress Holdings had increased since the business valuations were made and constituted an "undivided asset" not included in the court's April 19 statement of decision.

Penny supported her motion with a declaration by her accounting expert, William G. Essig, indicating that retained earnings had grown by $400,000 between year-end 2010 and June 2012. On appeal she asserts that retained earnings had increased steadily over the years to $5 million by year-end 2012, near the time of judgment. She also filed a declaration by Celeste Plaister, another accountant, who opined that Penny was due $429,382 for the period January 1, 2011 to September 30, 2012. The court denied the motion to reopen—which it considered "not well founded"—and sanctioned Penny for bringing it by requiring her to pay Tom's attorney fees incurred in opposing the motion ($21,745.16).

The court tried the issue of attorney fees on September 10, 2012. Although Penny was awarded $185,000 in fees based on need (§§ 2030, 2032), that amount was partially offset by $40,000 in fees awarded to Tom as a sanction for Penny's conduct increasing the costs of the litigation and for her attorneys' "obstreperous and unprofessional conduct."

Judgment was entered December 24, 2012.

5

## II. DISCUSSION

### A. Penny's Contentions

Penny appeals from the judgment and from the court's order denying her motion to reopen the evidence. (*Litvinuk v. Litvinuk* (1945) 27 Cal.2d 38, 43 [motion to reopen reviewable on appeal from judgment].) Her first complaint about the division of property is that the court improperly used an appraisal of Cypress Holdings dating back to December 31, 2010, without taking into account changed financial circumstances of the company between that time and entry of judgment. She further claims the court erroneously accepted Tom's expert's valuation of Cypress Holdings which was based on "marital value," rather than "investment value."

Penny's motion to reopen the evidence was grounded on her theory that the retained earnings of Cypress Holdings amounted to a community asset which should have been divided equally to the extent it was not needed for reinvestment in the grocery stores. She also claims Tom was responsible for proving the need for reinvestment of retained earnings.

Penny also contends the order of spousal support was inadequate because it did not take into account assets of Cypress Holdings and Spring Pond that could have been used to pay increased spousal support. She insists the court should have increased her support award to take into account the couple's "deliberately depressed lifestyle during the marriage" and their habit of saving and investing. She predicts she will be unable to continue saving and investing based on the amount of support ordered, while Tom will retain the ability to invest by continuing the couple's historic practice of using business income from the grocery stores to reinvest in the markets and to purchase other real properties.

Finally, Penny contends the overall distribution of marital property was inequitable and impractical and calls for reversal of the judgment. Urging us to order a new trial, she further asks that we order it heard by a different judge on remand, claiming that Judge Mayfield made so many errors and her orders resulted in such "inequity between the parties" that she should not be allowed to preside over a retrial.

6

**B.      Division of Community Property**

        1. <u>Legal Overview and Standard of Review</u>

Community assets must be divided equally in a dissolution action.  (Fam. Code,[3] § 2550.)  Section 2552, subdivision (a) addresses the date of valuation of community assets, requiring the trial court to "value the assets and liabilities as near as practicable to the time of trial."  Upon notice and for good cause, the court may value the assets "at a date after separation and before trial to accomplish an equal division of the community estate of the parties in an equitable manner."  (§ 2552, subd. (b).)

Penny cites this section in support of her argument that Cypress Holdings was valued as of the wrong date because Tom's expert, Thomas Berg, valued the assets as of December 31, 2010, a year before trial and two years before judgment.

The standard of review is the abuse of discretion standard.  (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572 (*Campi*); *In re Marriage of Quay* (1993) 18 Cal.App.4th 961, 966.)  Under that standard, we would reverse only if considering all the relevant circumstances, the court has " ' " 'exceeded the bounds of reason' " ' " or " ' "no judge would reasonably make the same order in the same circumstances." ' " (*In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1366.)

Insofar as the trial court made factual determinations—and the valuation of a business is a factual issue—we accept those facts as true so long as they are supported by substantial evidence.  (*Campi*, *supra*, 212 Cal.App.4th at p. 1572; *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 885 (*Hewitson*).)  To the extent our decision turns on the interpretation and application of a statute, it involves a pure question of law subject to de novo review.  (*In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 507.)

        2. <u>The Experts' Valuations of Cypress Holdings</u>

Berg had been retained by Tom to appraise the stock of Cypress Holdings in February 2010.  Tom tried to get Penny to agree to use a single appraiser, but Penny

---

[3] Undesignated statutory references are to the Family Code.

refused. Berg initially prepared an appraisal as of March 31, 2010. During this time, Tom was trying to get Penny to commit to a date upon which the company would be appraised. She delayed, so Tom had Berg prepare his appraisal as of December 31, 2010. Tom paid Berg more than $29,000 for the two appraisals. The court concluded it would be inequitable and impracticable to require Tom to pay for yet a third appraisal, given Penny's delaying tactics and lack of cooperation.

Berg estimated Cypress Holdings was worth $2.98 million as of year-end 2010. His report identified various methods of estimating the value of the stock of Cypress Holdings, including three different approaches: the market, income, and cost approaches. Within those approaches there are different methods of valuing a company.[4]

Berg chose to use the market and income approaches because the company is a going concern with material cash flow. He valued the company using the guideline public companies method, supplemented with the industry acquisitions method, and the income capitalization method. (See fn. 4, *ante*.) *Using* the market approach he calculated a valuation of $3.2 million. Under the income approach (income capitalization method) he estimated a value of $3,040,000. Believing the income capitalization method more accurately reflected the corporation's value, and employing a weighted average, he considered the operating controlling interest value of the company to be $3,090,000, which he adjusted to $2,980,000 after considering nonoperational assets and liabilities. His report appears to be comprehensive, balanced and well reasoned.

Penny's expert, Matt Morris, a broker based in Washington, D.C., prepared his appraisal as of June 30, 2011.[5] He began talking to Penny's attorneys in early 2011 and was retained June 7, 2011. His estimated value of Cypress Holdings was roughly $3.5

---

[4] Within the market approach there are the guideline public companies method, the industry acquisitions method, the small-company transactions method, and the subject entity transactions method. Within the income approach are the discounted cash flow method and the income capitalization method. And within the cost approach are the net book value method and the adjusted net asset method.

[5] Penny's attorneys suggest there was an agreement with Tom's lawyers to use June 30, 2011 as the appraisal date. The court found this was not true.

million ($3,462,621). Morris operated on the assumption that the markets would be sold as a going concern to a buyer already involved in the grocery business. He assumed the buyer would acquire the inventory, property, plant, equipment and liquor licenses, while the remainder of the balance sheet would be liquidated. He hoped to be able to sell the two markets individually, although Tom expressed skepticism whether it was feasible to run them independently.

Morris used four methods for valuing the business: comparable public company analysis, comparable transaction analysis, sales analysis, and adjusted earnings before interest, tax, depreciation and amortization (EBITDA) analysis. He evaluated the business at $5.9 million, less $2.4 million from the liquidation of the balance sheet, making the valuation $3.5 million. The factors he considered appear to be similar to the considerations used by Berg, but Morris's assumption was that the stores would be sold. Morris also weighted the results from the four methods, giving the greatest weight to the comparable transaction analysis, which compared the value of Harvest Markets to the value of other small grocery chains that had been sold to other grocery operators in 2006 to 2010.

Penny asserts the difference between Berg's valuation and Morris's reflects an increase in profitability of the business during the first six months of 2011. She further believes she has been denied the benefit of that increased value. But the difference in valuations appears to have resulted not only from the different dates on which the valuations were made, but different methodologies and assumptions employed. Berg testified that business appraisal is "part art, part science," which could largely explain the variance between Berg's valuation and Morris's.

3. The Trial Court's Valuation

The court valued Cypress Holdings at $3.18 million, specifically finding Tom's expert more credible for several reasons. First, it considered significant the fact that Berg interviewed top management at the Harvest Markets and became very familiar with the markets' business strengths and weaknesses, while Morris did not conduct any interviews. Second, the court disagreed with Morris's conclusion that the best way to

9

value the business would be to " 'expose it to the market,' that is, offer it for sale."  The court observed that family businesses " 'do not simply represent an investment of capital; they are also an investment of sweat, toil, worry and hopes.' "  The court also noted that Penny's idea of what should be done with the business "has varied throughout this litigation" from urging that the business be sold, to wanting to own the underlying properties (and thereby to become Tom's landlord), to simply complaining about the amount of the equalizing payment.  The court also expressed concern that Morris's company is directly involved in the sales and acquisitions of grocery stores and could potentially act as broker if the markets were sold.  The court was especially concerned about the cost of selling the markets, which was never spelled out clearly by Morris, and it noted there could be tax consequences of the sale of the business, as to which no evidence had been offered.  And finally, the court took into account that the retention of the business was " 'essential' " to Tom's ability to continue earning a living (and paying spousal support to Penny).

   4.  Valuation Date

  Seizing on the fact that Berg's analysis was dated December 31, 2010, Penny contends it was out of date and failed to take account of additional income to Cypress Holdings between that date and the date of the judgment (December 24, 2012).  We begin by noting that the trial court expressly denied that it valued the business as of December 31, 2010, but rather valued it at the time of trial.  It found Berg's appraisal was " 'as near as practicable' to the time of trial" within the meaning of section 2552; it had not used an alternative valuation date, as Penny now suggests.

  Penny's argument also overlooks the fact that the court did not blindly accept Berg's valuation of Cypress Holdings.  Instead it chose a number between Berg's and Morris's valuations, evidently in part to take into account the more recent results for the businesses after the date of Berg's valuation.  It added $200,000 to Berg's valuation based on Penny's evidence and arguments.  Thus, while the two experts' valuations were half a million dollars apart, the court narrowed the gap to $300,000.  Berg testified that a

variance of five or 10 percent between one expert's valuation and another's would not be unusual.

Although it is not possible to determine from the statement of decision exactly how the court chose its valuation number, that circumstance alone does not give rise to the inference that the court abused its discretion. The failure to specify exact calculations does not constitute reversible error. (*In re Marriage of Zaentz* (1990) 218 Cal.App.3d 154, 162–163, 167 (*Zaentz*).)

In *Zaentz* the issue related to characterization of profits from the husband's award-winning movie as separate or community property. (*Zaentz, supra,* 218 Cal.App.3d at p. 162.) Because he had devoted substantial efforts to the film during the marriage, the court apportioned some of the profits to the community after hearing extensive testimony, without spelling out its method of calculating that apportionment in detail. (*Id.* at pp. 165–167.) As here, the financial testimony provided conflicting evaluations and the husband claimed his experts held the better view. "Whether husband is unpersuaded by the testimony of wife's experts (in favor of that of his own experts) is of no consequence. The trial court was within its discretion to rely on that testimony notwithstanding the existence of conflicting evidence." (*Id.* at pp. 164–165.) As in *Zaentz*, the record here as a whole reflects "more than ample evidence" to support the court's decision. (*Id.* at p. 162.) Thus, under "established principles of substantial evidence," and viewing the evidence most favorably to the judgment, the trial court's decision must be upheld. (*Ibid.*)

5. Berg's Use of "Marital Value" for Asset Valuation

Penny also attacks Berg's valuation of Cypress Holdings because he used what he called the "marital value" of the businesses, as opposed to the "investment value." The term "marital value" appears to be one coined by Berg to indicate "the economic value of the business to the spouse retaining it, and who will continue to operate it in the future." The most significant aspect of Berg's "marital value" was that it did not include a minority interest discount or a marketability discount. Thus, a marital value assessment could be different from an investment valuation, but it was appropriate to the

circumstances, and in this case did not produce a result significantly different from the fair market value. In fact, Berg testified repeatedly on cross-examination that the "marital value" and "fair market value" would be the same in this instance.

We see no legal error in Berg's method. Nor does it appear such a valuation is, as Penny suggests, a forbidden departure from ordinary rules of business valuation. Berg's declaration said his findings were in compliance with the Uniform Standards of Professional Appraisal Practice. There was substantial admissible evidence supporting the trial court's reliance on Berg's reasoning.

As Penny points out, Morris's valuation reflects what the grocery stores would be worth to a third party buyer, which she continues to advocate as the proper valuation, although she does not appeal the court's decision to award Cypress Holdings to Tom. She thus sidesteps discussing the court's reasons for rejecting a sale of the business, which included Tom's "expressed concern that he would be out of a job if the business was sold," whereas if he were allowed to continue to run the markets "he will have a steady income stream from which to pay permanent spousal support, thus benefiting both parties." In effect, Penny theorizes that Cypress Holdings must be valued as if the markets were being sold to a third party, without taking account of the added cost of doing so or the tax implications, and even though the business was ordered not to be disposed of in that manner. Penny has cited no legal authority to mandate such a result.

Both parties and the trial court cited *Hewitson*, *supra*, 142 Cal.App.3d 874, which held it was erroneous to value a closely held corporation based on a price to earnings analysis using as comparators companies acquired by other corporations in exchange for stock, rather than strictly cash acquisitions. (*Id*. at pp. 883–884.) Because the court found the considerations affecting value to be different in those two types of transactions, it reversed a property division that relied exclusively on the discredited method. (*Id*. at pp. 885–886.)

*Hewitson* does not compel reversal of the valuation in this case. The trial court found both Berg and Morris used methods acceptable under *Hewitson*, *supra*, 142 Cal.App.3d 874 in analyzing the company's value, and we agree. Berg used an amalgam

12

of the guideline public companies method and the industry acquisitions method to establish the marital value under the market approach. He considered the income approach and the income capitalization method to be the most meaningful basis of comparison, and he gave that method more weight in arriving at his valuation. The court's reliance on Berg's valuation was not in conflict with *Hewitson*.

Regardless of terminology, both Berg and Morris considered many of the same factors in valuing the stock, including the value of comparable public companies, prior same industry sales, past performance of the grocery stores themselves, and the future economic outlook nationally, statewide and locally, as well as challenges to the market in groceries.

Even if Berg's approach was novel (and we do not believe it is), that would not be indicative of a misunderstanding of the concepts governing valuation of business assets in a marital dissolution action. Berg was qualified as an expert based on his education and experience. (Evid. Code, § 801.) He testified about the facts and assumptions he used in his valuation. Any substantive quarrel Penny may have with Berg's valuation methodology goes to the weight, not the admissibility, of his testimony. (*People v. Brown* (2014) 59 Cal.4th 86, 100.) To the extent Penny suggests we reweigh the two expert opinions, she invites us to overstep the proper scope of our review.

6. Denial of Penny's Motion to Reopen Evidence

As noted above, Penny moved to reopen the evidence approximately seven months after the close of evidence, on the date scheduled for trial on the attorney fees issue. She sought to introduce additional evidence she claimed would show Cypress Holdings' earnings had increased substantially by the second quarter of 2012. Penny justified her motion on the basis that she did not have second quarter 2012 financial statements for Cypress Holdings until September 2012. She now claims denial of the motion to reopen was legal error warranting a new trial.

Denial of such a motion is ordinarily reviewed for abuse of discretion. (*In re Marriage of Olson* (1980) 27 Cal.3d 414, 422 (*Olson*).) Penny, nevertheless, argues we

13

should review the order de novo because section 2556 made reopening mandatory.[6] (*Olson, supra,* 27 Cal.3d at p. 422.)  The trial court rejected that argument because the assets divided at trial had not changed character in the interim.  Rather, the grocery stores merely had continued operations in the same way they had operated before division of the couple's assets.  In such circumstances the abuse of discretion standard applies.  (See *In re Marriage of Hahn* (1990) 224 Cal.App.3d 1236, 1238, 1240–1241.)

Although Penny claims her motion was based on "new evidence," the evidence Penny wanted to introduce consisted of her experts' analysis of more recent financial results for Cypress Holdings, which the court found were not "substantially different from what [Penny] knew or suspected they would be at the time of trial."  Her objective was to show the grocery stores had income between year-end 2010[7] and September 2012 which constituted a community asset not included in the Berg and Morris appraisals and hence not divided by the trial court in its statement of decision.  It appears Penny's position was that retained earnings of Cypress Holdings should have been treated as an asset to be valued and divided separately from the business as a whole.  Penny also argued that Tom had paid down debts after the trial and thereby increased the value of assets that had been assigned to him.  On appeal she argues that income to Spring Pond between trial and judgment also should have been subject to division.

The court denied the motion because (1) "[t]he retained earnings which [Penny] seeks to divide were considered in determining the value of the business as of the date of

---

[6] Section 2556 reads:  "In a proceeding for dissolution of marriage, for nullity of marriage, or for legal separation of the parties, the court has continuing jurisdiction to award community estate assets or community estate liabilities to the parties that have not been previously adjudicated by a judgment in the proceeding.  A party may file a postjudgment motion or order to show cause in the proceeding in order to obtain adjudication of any community estate asset or liability omitted or not adjudicated by the judgment.  In these cases, the court shall equally divide the omitted or unadjudicated community estate asset or liability, unless the court finds upon good cause shown that the interests of justice require an unequal division of the asset or liability."

[7] Penny's attorneys continue to insist the court had valued Cypress Holdings as of December 31, 2010, not at the time of trial, even though the court specifically clarified that it valued the company at the time of trial.

trial"; (2) there had been no change in the nature of Cypress Holdings and Spring Pond; (3) Penny and her attorneys "were well aware that Cypress Holdings generated profits pre-trial and, in the absence of unforeseen circumstances, would continue to do so after the trial concluded," and thus the failure to raise the issue at trial was a "tactical decision or error" on counsel's part that did not warrant reopening; (4) Penny was not diligent in bringing the motion, and the timing suggested she was trying to delay the trial on attorney fees; (5) the evidence Penny sought to introduce was not sufficiently material to require reopening; and (6) even if the motion were granted, postseparation efforts of one spouse in possession of a community business which increase the business's value "may warrant dividing the increase between the community and the operating spouse's separate property." (See *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 624–625 [may warrant valuing business at date of separation]; *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 20.)

Penny insists we must, as a matter of law, consider retained earnings an asset of the community at the time of judgment in which she was entitled to share equally, or which at least should have been deemed available to Tom to pay spousal support. We disagree. The financial information available to Penny at trial revealed the growing retained earnings—from $1.7 million in 2006 to $4.2 million as of September 2011—and the legal theory that part of that amount should be divided as a community asset was available to her attorneys at trial. To the extent Penny's motion was grounded on a new legal or accounting theory rather than new evidence, it did not justify reopening the evidence.

In opposition to Penny's motion, Tom submitted his own declaration describing the need for additional capital improvements for the markets, and a declaration by James Caven, a certified public account and business valuation expert. Caven opined that (1) all of the changes pointed out by Penny had occurred in the ordinary course of business; (2) retained earnings "have not increased . . . by nearly as much as Mr. Essig and Ms. Plaister claim" and actually increased by only $99,722.30 between June 2011 and June 2012; (3) Tom did not pay down debts beyond the payments required by the terms of the

15

loans; (4) equity resulting from principal paydowns of loans had "increased only by relatively modest amounts"; (5) both the current ratio and the sales to working capital ratio—two indicators of the financial health of a grocery store—were below the industry median; (6) average capital expenditures had decreased during the litigation; (7) $250,000 was urgently needed for further capital expenditures; (8) "Cypress Holdings needs to reinvest . . . profits to return the company back to industry norms"; and (9) the opinions of Penny's experts were based on an "incomplete analysis."

Thus, there was substantial evidence to support the court's finding that Penny's "new evidence" was not sufficiently material to warrant reopening. On that basis alone, we would find no error in the denial of the motion. Considering all of the court's other reasons, there was clearly no abuse of discretion.

## C. Spousal Support

### 1. Penny's Position

Penny contends the amount of permanent spousal support was insufficient as a matter of law, the court failed to consider factors it was required to consider under the applicable statutes, and the award of 20 percent of Tom's future distributions from Cypress Holdings was "illusory and insufficient." She complains generally that she was receiving $15,576 per month in temporary spousal support, which was reduced to $7,084 as permanent support. Such a reduction, however, is not unusual.[8] More specifically, she contends the court erred in assessing Tom's ability to pay and failed to consider the financial disparity between the parties.

---

[8] " 'Temporary support . . . usually is higher than permanent support because it is intended to maintain the status quo *prior* to the divorce.' " (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442 (*Blazer*).) Permanent support, on the other hand, is intended to provide financial assistance as determined by the financial circumstances of the parties after their dissolution and the division of their community property, and is supposed to reflect a complex variety of factors established by statute and legislatively committed to the trial court's discretion. (*Ibid*.; *In re Marriage of Winter* (1992) 7 Cal.App.4th 1926, 1932 (*Winter*).)

2. Legal Overview and Standard of Review

Permanent spousal support is governed by the statutory scheme set forth in sections 4300 through 4360. Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320. These circumstances include the supporting spouse's ability to pay; needs of each spouse based on the marital standard of living; obligations and assets of each spouse, including separate property; and any other factors necessary for a just and equitable award. The court has broad discretion in balancing the statutory factors of section 4320 to accomplish substantial justice between the parties. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304 (*Cheriton*).)

As with the question of property division, a court's determination of spousal support is reviewed for abuse of discretion. (*Campi*, *supra*, 212 Cal.App.4th at pp. 1572, 1576–1577.) Penny urges us to apply a de novo standard of review because, she claims, the court's application of *Blazer*, *supra*, 176 Cal.App.4th 1438, to an undisputed set of facts amounted to an error of law warranting our independent review. She also claims the amount of support awarded was "insufficient as a matter of law." We are unpersuaded. In the cases cited by Penny, the resolution of the appeal turned on an analysis of the language of a statute.[9] The same is not true here, where Penny's position is simply that the amount awarded for support was inadequate. There is no legal dispute about the

---

[9] Penny cites *In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1145 [whether wife's commitment ceremony constituted a "remarriage" within the meaning of § 4337]; *In re Marriage of Campbell, supra,* 136 Cal.App.4th 502, 506–507 [whether § 4337 "remarriage" applied to a party's attempt to remarry before judgment of divorce]; *In re Marriage of Thornton* (2002) 95 Cal.App.4th 251, 253–254 [whether stipulated judgment that did not provide for termination of support on remarriage constituted a waiver of § 4337]; and *In re Marriage of Terry* (2000) 80 Cal.App.4th 921, 928–929 [whether party's separate estate is "sufficient for the party's proper support" under § 4322].)

meaning of the words in section 4320 or any other legal question. Therefore, de novo review is not appropriate.

### 3. The Trial Court's Ruling

The trial court ordered Tom to pay permanent spousal support to Penny in the amount of $7,084 per month. In arriving at that amount, the court considered the marital standard of living, Tom's ability to pay spousal support, Penny's needs based on the marital standard of living, the obligations and assets of each party, their health and ages, the duration of the marriage, and the immediate and specific tax consequences to each party. It found the other factors listed in section 4320 were not applicable to this case.

Having determined the marital standard of living to be upper class and "very nice, [but] not lavish," the court relied primarily on Penny's own sworn statements regarding her financial needs. According to Penny's own testimony, she was paying $3,800-$3,900 per month for a two-bedroom apartment in Texas. "In the Income and Expense declarations [Penny] signed on April 20, 2011 and August 19, 2011, [she] listed actual expenses of $12,970-13,150 per month *which included* $2,000 for savings and investments, $1,000 for charitable contributions, and $1,500 for entertainment, gifts and vacations . . . . It was incongruous that [Penny's] Income and [Expense] Declaration filed December 7, 2011, literally on the eve of trial, suddenly showed monthly expenses of approximately $27,000 per month. The court finds that the latter figure was neither supported by the evidence, nor credible."

Penny has not undertaken to explain why her estimated financial needs more than doubled in the space of three months. Presumably, her much changed declaration reflected the opinion of her accounting expert, Essig, that taking into account the parties' investments in real estate and capital expenditures (which he deemed discretionary), Penny would need $27,775 per month to maintain the marital standard of living.

This was much more than the $8,983 per month that Tom's accounting expert, Caven, estimated Penny needed. The court credited Caven's testimony over Essig's, but thought his final number was a little low. Considering Penny's earlier financial

18

declarations, the court found she needed approximately $12,000 per month to support herself in accordance with the marital standard.

The court further found that Tom had the ability to earn $278,600 per year (his base salary from Cypress Holdings, plus the salary he received as a bank director). The court noted that Penny's needs ($144,000 per year) amounted to more than half of Tom's annual salary.

In determining that Tom should pay $7,084 to Penny monthly, the court reasoned that Penny would have an additional $2,000 net monthly rental income from the veterinary clinic housed in Paddleford House. Penny had also expressed an interest in buying a house for herself. The court calculated that, with the equalizing payment of more than $1.5 million, Penny could use $400,000 to $500,000 as a down payment while still retaining the ability to earn approximately $35,000 per year from the remainder of the equalizing payment (or $2,916 per month). This calculation was consistent with the testimony of Caven, who predicted that Penny could expect a 3.5 percent return on her investment of those funds. Thus, Penny had income of $4,916 per month based on the property division, leaving a deficit of $7,084 in meeting her monthly needs, which Tom was ordered to pay. In addition, Tom was ordered to provide Penny with health insurance. The court further ordered that if Tom were to take bonuses or other distributions from Cypress Holdings above his base salary, he would have to pay 20 percent of any such amounts to Penny as additional support. And finally, the undeveloped land known as the Art Center could potentially be developed in the future with a small housing complex so that it could become an income-producing property. The court further noted that Penny had inherited $50,000 as separate property in January or February 2011.

Thus, the spousal support ordered for Penny gave her an amount that, by her own financial declarations, met her expenses, including the amount she estimated for savings and investment, charitable contributions, entertainment, gifts and travel. As we shall explain, we find no abuse of discretion in the court's determination.

4. Alleged Error in Determining Tom's Ability to Pay

In setting spousal support the trial court is required to assess the "ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living." (§ 4320, subd. (c).) Penny contends the trial court erred as a matter of law through its "refusal to consider income clearly available to Tom." Penny contests the court's finding that Tom had available to him $278,600 per year from which to pay spousal support, contending that retained earnings are a "species of savings," and hence Cypress Holdings' retained earnings—or some portion thereof—should have been considered available to Tom to pay spousal support.

Penny likens her circumstances to those in *Winter*, *supra*, 7 Cal.App.4th at page 1931, a previous decision by this court, where a wife was awarded temporary spousal support at a level that would allow her to continue the parties' habit of saving and investing so as to maintain the marital standard of living while awaiting trial. The couple had lived modestly during their marriage, leaving a large portion of their income available for investments. (*Id*. at pp. 1930–1931.) The husband, whose income was much higher than the wife's, did not dispute that he was able to pay the amount of support provided under the temporary support guidelines, but claimed the amount was excessive given their modest lifestyle. (*Id*. at p. 1932.) The trial court held " 'the supported spouse should have the same opportunity to have a certain portion of support payable to her that would allow her to continue the lifestyle that she had, at least on a temporary basis, of having some discretionary income for the purposes of investing, just as husband would have the right to utilize a portion of the money retained by him for investing.' " (*Id*. at p. 1931.) In affirming the award, the appellate panel noted, "we fail to see why Wife should be deprived of her accustomed life-style just because it involved the purchase of stocks and bonds rather than fur coats." (*Id*. at pp. 1932–1933.) The same rationale has been applied in cases involving permanent spousal support. (*In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086, 1096–1097.)

20

Notably, however, *Winter* and *Drapeau* involved ordinary investing from the spouses' salaries that was not used for living expenses. Neither those nor any other case cited by Penny requires amounts retained in a family business to be attributed to the supporting party to pay spousal support.

In *Blazer*, *supra*, 176 Cal.App.4th 1438, the Sixth District held that assets used to diversify the husband's business could properly be excluded from consideration as being available for spousal support because the undercapitalization of the business and the need to diversify were supported by the husband's testimony and that of his experts. (*Id*. at pp. 1440, 1444.) The court held, "in the face of an ambiguity as to whether disputed sums represent income available for support, that determination is committed to the [trial] court's discretion." (*Id*. at p. 1448.)

Penny now insists, even if some of Cypress Holdings' retained earnings could properly be allocated to the business, the court should have allocated any amounts not needed for capital investment to Tom for purposes of paying spousal support. She argues the court should have imposed on Tom the burden of proof to justify any sums that might be retained for reinvestment in the business.

Caven's declaration in opposition to Penny's motion to reopen, the substance of which was summarized above, opined that the Harvest Markets were undercapitalized even as of October 2012. These statements supported the trial court's refusal to reopen the evidence and reconsider its treatment of retained earnings as an asset available to pay spousal support. (*Blazer*, *supra*, 176 Cal.App.4th at pp. 1447–1448.)

Penny's reliance on *In re Marriage of Drapeau*, *supra*, 93 Cal.App.4th 1086 is equally unavailing. There, Division Three of this court held the trial court erred in failing to consider a husband's enhanced retirement benefit part of the community assets where it had been earned during the marriage and before separation, although the enhanced benefit had not been offered until after separation. (*Id*. at pp. 1090, 1093.) The appellate court also found spousal support inadequate where the award did not allow the wife to continue saving at the same rate she had during the marriage and the husband's means allowed him to continue saving. (*Id*. at p. 1096.)

21

But there is a difference between savings put aside by employees to provide for an early retirement, as in *Drapeau*, and retained earnings in a business. Penny would have us treat the retained earnings in the business as a savings account, but as Caven testified, a business is "not an ATM machine" from which cash may be withdrawn at whim. Rather, the future needs of the business must be considered and adequate provision made to protect its viability. The expert testimony about the realities of the grocery business supports the view that taking cash from Cypress Holdings requires restraint and careful consideration so as not to impair the Harvest Markets' future success. And though Penny asserts repeatedly that Tom has $1 million a year at his personal disposal, the trial court specifically found that was not true, given the need for reinvestment in the business.

5. Consideration of Parties' Financial Disparity

Penny contests the trial court's alleged failure to properly consider the disparity in the couple's financial circumstances. This factor is not one specifically listed in section 4320 as a mandatory consideration. Rather, *Cheriton* held that such disparity should be considered as part of the "balance of hardships to the parties," specified in section 4320, subdivision (j). (*Cheriton*, *supra*, 92 Cal.App.4th at pp. 306, 320.) But the facts here do not reveal the stark disparity involved in *Cheriton*, where the husband held separate property stock and options worth tens of millions of dollars, while the wife and four children were crowded into a small rental house where the wife was forced to sleep in the living room on a sofa bed. (*Id.* at pp. 280–281.) In *Cheriton*, the welfare of the couple's children was also a major concern, and that factor is lacking here.

Penny's argument is largely a rehash of points already discussed. Penny argues that the court gave insufficient consideration to Tom's assets because, she insists, Tom has a greater ability to pay than is reflected in his salary alone. Tom's expert supported the view that the earnings of Cypress Holdings should be reinvested in the company. The trial court found Tom's expert more credible than Penny's, and we are not at liberty to displace that determination with our own. (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175; *In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1051–1052; *Zaentz*, *supra*, 218 Cal.App.3d at p. 163.)

22

6. *Ostler-Smith* Award

The court awarded Penny a 20 percent interest in any funds later distributed to Tom from Cypress Holdings above his base salary, commonly known as an *Ostler-Smith* award. *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33 (*Ostler & Smith*) involved a husband who earned a substantial portion of his annual income in bonuses. (*Id*. at pp. 37–38.) Because no future bonuses were guaranteed, the trial court found it would be inappropriate to consider that income in setting the fixed amount of spousal and child support. (*Id.* at p. 41.) Instead, it ordered that, in addition to a fixed amount of support that would allow the wife and sons to live at the marital standard, the husband should pay the wife 15 percent of future bonuses as spousal support, as well as 10 percent of future bonuses for each of the 2 minor children. (*Id.* at p. 42.) The Court of Appeal rejected the husband's challenge to the award, even though the percentage payments would allow the family to live above the marital standard, where the husband had the ability to pay the amount ordered. (*Id.* at pp. 46, 48.) The Court of Appeal in *Ostler & Smith* reasoned that such an award was appropriate where one spouse had a "secure financial future" while the other had "no financial cushion." (*Id.* at pp. 40, 48.) A similar order was appropriate here.[10]

As in *Ostler & Smith*, the amount and timing of Tom's future distributions from Cypress Holdings is uncertain and the court did not err in setting a fixed award without regard to future distributions. Yet, the record shows the parties had previously taken distributions from Cypress Holdings to pay for, among other things, taxes and travel. If Tom were to continue in that pattern, a percentage awarded was a fair way of allowing Penny to share in any such additional distributions. Thus, to the extent Tom uses Cypress Holdings to fund a higher lifestyle for himself, Penny may expect an increase in her own income as well, based on the 20 percent provision.

---

[10] Tom does not object to paying the *Ostler-Smith* award; in fact, he volunteered to pay 17 percent.

23

Penny claims, however, the percentage awarded was "illusory and insufficient" because "it is entirely within Tom's control whether he takes distributions or not. . . . Tom has the viable option of continuing to reinvest income in the businesses, thereby increasing their value and avoiding paying any additional spousal support." We think that is unlikely, given the fact that a large portion of Tom's base salary must be paid in spousal support, he must pay off the loan that allowed him to make the equalizing payment, he has traditionally paid taxes using Cypress Holdings' funds, and he has continuing mortgage obligations on the real properties he was awarded.

Consequently, we place little weight on Penny's argument that taking future distributions is "entirely within Tom's control." Penny's argument that Tom could borrow against retained earnings until he disposes of the markets reveals a lingering suspicion that Tom is intent on depriving her of what she is rightfully due, which the trial court found to be untrue. It has not been Tom's habit to burden himself with excess debt. The *Ostler-Smith* award is not illusory and the percentage awarded was well within the trial court's discretion.

**D.    Overall Inequitable Distribution of Property**

Penny argues that community property must be not only "mathematically equally divided," but the division must also be "meaningful." (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 885 [" 'practical and equitable' "].) Once again, we apply the abuse of discretion standard of review. (*In re Marriage of Verlinde* (1987) 189 Cal.App.3d 918, 923**.**) To the extent the court made factual findings, such as asset valuation, the substantial evidence test applies. (*Campi*, *supra*, 212 Cal.App.4th at p. 1572; *Hewitson*, *supra*, 142 Cal.App.3d at p. 885.)

Penny contends that Tom has $1 million per year at his disposal through the earnings of the Harvest Markets, while she is nearly 60 years old, disabled, unable to work, and without means to invest as she and Tom had done when they were married. Penny's argument on this issue is mostly a repackaged version of the arguments already discussed.

More important, Penny's premise is flawed. There was not a grossly disproportionate division of property. As detailed above, when the equalizing payment of $1.5 million is taken into account, each spouse received approximately $3.3 million in assets. The court's reasons for dividing the property as it did were well thought out and articulated.

Cypress Holdings was awarded to Tom in part because Penny did not want to continue running the markets and admitted she could not do so. The court explained that Tom, who had run the business for decades, might be out of a job if the businesses were sold. We have discussed already the court's other reasons for awarding Cypress Holdings to Tom rather than ordering the markets sold.

Aside from Cypress Holdings, the major assets that could have been awarded to Penny, but were not awarded to her, were the marital home and the real property that housed Mendosa's. The court awarded the home to Tom only after finding that Penny did not genuinely want it, whereas Tom needed a local residence, was able to keep up the mortgage payments, and was more emotionally attached to the ranch.

The court further explained that it was not a good idea to give all of the Spring Pond assets to Penny (although she got two of the three) because then she would be Tom's landlord and that would constitute a continuance of "the residual property bond which subsists as an unwelcome vestige of the dissolved marriage." (*In re Marriage of Knickerbocker* (1974) 43 Cal.App.3d 1039, 1048.)

However, in keeping with Penny's desire to be awarded income-producing assets, the court awarded Paddleford House to her, which produced $2,560 per month in rent from the veterinary clinic. The court also found, based on substantial evidence, it would be possible to develop the Art Center property so as to make it an income-producing asset as well. Since she was awarded $1.5 million in cash, Penny presumably would have the resources to undertake such development if she cared to, which could increase the return on her investment.

The court also had a substantial basis for its estimate of the income Penny could expect on the equalizing payment, and explained how she could achieve her objective of

25

buying a home with her half of the property.  We conclude the trial court's distribution of the community assets was sound, practical and equitable.

Though Penny insists Tom will end up with a better lifestyle and a greater opportunity to invest than she will be able to afford, the court found this was not necessarily so, given that Tom will be required to repay a substantial loan needed to fund the equalizing payment.  Add to that the spousal support of $7,084 monthly that Tom is required to pay, and Penny's claim that Tom is certain to enjoy a better lifestyle must be questioned.  And, of course, to the extent Tom decides to take additional distributions from Cypress Holdings above his salary—whether to boost his own lifestyle, to pay taxes, to travel, or to pay what is required of him under the judgment—Penny will share in 20 percent of those distributions.

Penny further complains that Tom will have a greater return on his investments than she will.  She claims Tom's investments earn approximately eight percent per year, while her investment opportunity will likely be limited to 3.5 percent.  The court rejected this argument in its tentative ruling because Penny will not be limited to "passive investment," but rather could be "more aggressive" and potentially earn a higher rate of return.  After all, Tom's assets are not primarily passive investments.  They require future dedication of energy, time and talent to realize the returns realized in the past.  Even if Tom, through his own future industry, ends up with a somewhat higher lifestyle than Penny, that is not unjust so long as Penny is able to sustain the marital standard of living. (*In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 568; *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 487.)  There was no abuse of discretion.

E.      **Request to Proceed Before Different Judicial Officer**

Because we affirm the judgment, there is no need to discuss Penny's argument that the case should be remanded for retrial before a different judge.  However, to the extent Penny insinuates Judge Mayfield was less than impartial, we must disagree.  In fact, the judge explained at some length in her statement of decision dated April 19, 2012, the cogent reasons why she found some of Penny's evidence was not credible.  Significantly, Tom's daughter testified that Penny said she wanted to make the divorce as expensive as

26

possible so Tom would not want to go through with it and they could be reunited. The judge's doubts about Penny's conduct were grounded in the evidence, not prejudice. Judge Mayfield also fully explained her finding that Penny's attorneys had engaged in "obstreperous and unprofessional conduct," and had unnecessarily increased the cost of litigation. We are satisfied the judge's rulings did not reflect a lack of impartiality.

## III. DISPOSITION

The judgment is affirmed. Tom is awarded his costs on appeal.

_____
Bolanos, J.*

We concur:

_____
Ruvolo, P.J.

_____
Rivera, J.

* Judge of the San Francisco City and County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27

Filed 5/6/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the Marriage of PENNY and THOMAS MITCHELL HONER. | A137961 |
| PENNY HONER,<br><br>        Appellant,<br><br>v.<br><br>THOMAS MITCHELL HONER,<br><br>        Respondent. | (Mendocino County Super. Ct. No. SCUK CVFL - 09 54651)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on April 9, 2015, was not certified for publication in the Official Reports.  After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105(b), it is hereby ordered pursuant to rule 8.1110 that the opinion shall be published in the Official Reports, with the exception of parts II.C. and II.E.

DATED:

_____
RUVOLO, P. J.

1

Trial Court:                          Mendocino County Superior Court

Trial Judge:                         Hon. Cindee F. Mayfield

Counsel for Appellant:               O'Brien Watters & Davis, Noreen M. Evans,
                                     Michael G. Watters, Deirdre Taber Kingsbury

Counsel for Respondent:              Perry, Johnson, Anderson, Miller & Moskowitz,
                                     Lawrence A. Moskowitz, Deborah S. Bull

A137961, *Marriage of Honer*