Filed 12/16/21  Marriage of Harvey CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of MICHAEL S. and CYNTHIA M. HARVEY. | |
| MICHAEL S. HARVEY, Appellant, v. CYNTHIA M. HARVEY, Appellant. | F078166 (Super. Ct. No. 457566) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Loretta Murphy Begen, Judge.

Shore McKinley Conger & Jolley and John H. McKinley; Downey Brand, Jay-Allen Eisen, Bradley C. Carroll, and Joseph K. Little for Appellant Michael S. Harvey.

Arnold & Porter Kaye Scholer, Sean M. SeLegue and Sean A. McCormick; Goss & Goss, Michael A. Goss and Mark A. Goss for Appellant Cynthia M. Harvey.

-ooOoo-

## INTRODUCTION

This is an appeal and cross-appeal from a July 23, 2018 judgment of the Stanislaus County Superior Court.

Appellant Michael S. Harvey and appellant Cynthia M. Harvey[1] married in 1988. Three years later, Michael founded and incorporated Enviro Tech Chemical Services, Inc. (Enviro Tech), a chemical manufacturing company. By 2010, the Harveys jointly owned 825 shares in Enviro Tech, amounting to nearly 70 percent of the outstanding common stock. On March 14, 2011, they signed a "**SHAREHOLDER BUY-SELL AGREEMENT**" (Agreement), which included provisions relating to a "**Sale on Marital Dissolution or Separation of Shareholder**."

The Harveys separated on October 23, 2011. Thereafter, Michael purchased additional Enviro Tech shares from other stockholders. He also petitioned for dissolution of marriage. Pursuant to Family Code section 2337, the superior court bifurcated the issue of marital status. In May 2015, the Harveys' marriage was terminated.

In a "**FINAL JUDGMENT ON RESERVED ISSUES**" filed on July 23, 2018, the court concluded that the fair market value of Cynthia's one-half interest in the jointly owned Enviro Tech shares was $21,332,000 as of December 31, 2017; awarded Michael "all right, title, and interest in and to" these shares; and ordered Michael to pay Cynthia $21,332,000 as equalization, either as a one-time lump sum or in installments pursuant to the terms and conditions of a seven-year promissory note. The court also concluded that Cynthia "failed to establish any impairment of [her] undivided one-half interest in the

---

**1** Henceforth, where appropriate, we will identify the parties individually by their given names to avoid confusion. No disrespect is intended. (*Estate of Austin* (2010) 188 Cal.App.4th 512, 514, fn. 1; *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

In addition, unless otherwise indicated, we will subsequently identify persons who share a given name with a party by his or her last name to avoid confusion.

community estate from any breach of fiduciary duty by [Michael]." (See Fam. Code, § 1101, subd. (a).)

On appeal, Michael contends that the court erred by disregarding Section 11 of the Agreement, "which sets out the terms on which the [Enviro Tech] shares are to be purchased from Cynthia," and imposing "significantly more burdensome" and "onerous terms and conditions on [his] acquisition of [Cynthia's] shares." We conclude that Section 11 did not apply.

On cross-appeal, Cynthia contends that the court "erred in applying two discounts to the valuation of [her] interest in the 825 community shares of [Enviro Tech]." (Boldface & capitalization omitted.) First, "the court erred in applying a discount for possible future taxes that were not immediate and specific." (Capitalization omitted.) Second, "the trial court improperly utilized a marketability discount in valuing [Enviro Tech]." (Capitalization omitted.) Cynthia further contends that the court "erred by denying relief to [her] regarding Michael's secret purchases of additional [Enviro Tech] shares." (Boldface & capitalization omitted.) We conclude: (1) the valuation erroneously accounted for a tax liability that was not immediate and specific, but substantial evidence supported a discount for lack of marketability; and (2) the court impliedly made the factual findings necessary to support its ruling regarding Cynthia's breach of fiduciary duty claim.

## STATEMENT OF FACTS

**I.     The Agreement**

The Agreement read, in part:

> "This Shareholder Buy-Sell Agreement ('Agreement') is made and entered into . . . by, between and among MICHAEL S. HARVEY and CYNTHIA M. HARVEY, Trustees of the MICHAEL AND CYNTHIA HARVEY REVOCABLE TRUST dated December 20, 2010 ('Harvey

3.

Trust') and MICHAEL B. ARCHIBALD[2] and DEBRA L. ARCHIBALD, Trustees of the ARCHIBALD 2010 REVOCABLE TRUST dated June 22, 2010 ('Archibald Trust') and ENVIRO TECH CHEMICAL SERVICES, INC., a California corporation (the 'Corporation'). The Harvey Trust and Archibald Trust are collectively but nonspecifically referred to herein in the singular as 'Shareholder' and in the plural as 'Shareholders.' The Corporation and Shareholders are collectively but nonspecifically referred to in this Agreement in the singular as 'Party' and in the plural as 'Parties.'

"**Section 1.** <u>Recitals</u>.

"**A.** The Shareholders are the owners of a portion of the outstanding common stock of the Corporation as follows:

| "<u>Shareholder</u> | <u>Number of Shares</u> |
|---|---|
| "Harvey Trust | <u>825</u> . . . |
| "Archibald Trust | <u>275</u> . . . |

"**B.** The remaining shares of the Corporation which are owned by persons or entities other than the Shareholders are owned as follows:

| "<u>Shareholder</u> | <u>Number of Shares</u> |
|---|---|
| "Fernanda Cabral | 5 |
| "John Pray | 60 |
| "Jon Howarth, PhD | 32 |

"The Shareholder's [*sic*] agree that such shares are not subject to the terms of this Agreement.

"**C.** This Agreement is entered into with respect to all shares of common stock of the Corporation, now or hereafter owned by the Shareholders, for the purpose of protecting the Corporation and the Shareholders, as well as providing continuity for the Corporation's business in the event of the occurrence of certain events discussed in this Agreement. [¶] . . . [¶]

---

[2] Henceforth, where appropriate, we will identify Michael Archibald individually by his full name to avoid confusion.

4.

"NOW, THEREFORE, in consideration of the mutual agreements, conditions, covenants, promises, representations, undertakings, and warranties contained herein, the Corporation and Shareholders agree as follows:

"**Section 2.** **Restriction On Transfer.** The Parties hereby mutually agree to restrict their respective right and ability to freely transfer the shares owned by each Shareholder in accordance with the terms and conditions set forth in this Agreement. None of the shares presently owned or subsequently acquired by the Shareholders shall be sold, pledged, encumbered, transferred, or disposed of in any way, whether voluntarily, involuntarily, or by operation of law except under the terms of this Agreement. . . . [¶] . . . [¶]

"**Section 4.** **Option to Purchase.**

"**A.** No Conveyance. Except as specifically provided in this Agreement, no Shareholder shall sell, transfer, assign, pledge, encumber, hypothecate, or in any way dispose of any of his or her shares (all of which shall be deemed a 'transfer') or any right or interest in them. A Shareholder desiring to transfer his or her shares shall give written notice (for purposes of this Section 4.A., 'Offer Notice') to the Corporation and the other Shareholders, in accordance with Section 19 of this Agreement, of his or her intention to transfer his or her shares or an interest in them. The notice must include the name and address of the proposed transferee and specify the number of shares to be transferred, the interest to be transferred, the price per share, and the terms of payment. Promptly on receipt of the notice, the Secretary of the Corporation shall forward a copy of the notice to each member of the Corporation's board of directors.

"**B.** Corporation Option Period. Provided Section 7 below ('Drag-Along and Tag-Along Rights') is not applicable or if such Section is applicable, the option conferred thereunder has not been exercised, then for a period of the longer of: (i) one hundred eighty (180) days following the receipt of the Offer Notice by the Secretary of the Corporation, or (ii) ninety (90) days following the final determination of value under Section 10 of this Agreement ('Corporation Option Period'), the Corporation shall have the option to purchase all or any portion of the offered shares, at either the price and terms stated in the Offer Notice or at a price determined under Section 10 of this Agreement and the terms set forth in Section 11 of this Agreement as determined at the option of the Corporation. [¶] . . . [¶]

5.

"**D.**    Shareholder's Option Period.  Provided Section 7 below ('Drag-Along Rights') is not applicable or if such Section is applicable, the option conferred thereunder has not been exercised, then, if the Corporation fails to exercise its option as to all of the offered shares within the Corporation Option Period, then for ninety (90) days following the expiration of the Corporation Option Period, the other Shareholders shall have the option to purchase all or any portion of the offered shares not purchased by the Corporation ('Shareholder Option Period'), at the same price and terms as provided to the Corporation in subpart 4.B. above, as elected by the purchasing Shareholder(s).  [¶] . . . [¶]

"**Section 5.    Other Events Giving Rise To Option To Purchase.**

"**A.**    Triggering Events.  On the occurrence of the following events (each being a 'Triggering Event') the Corporation and the Shareholders shall have an option to purchase the shares of the Shareholder and his or her spouse (and the shares of any permissible transferee[3] to whom such Shareholder has previously transferred shares of the Corporation), if any, who is the subject of the event giving rise to the option to purchase. [¶] . . . [¶]

"(1)    Bankruptcy / Involuntary Dissolution.  In the event any Shareholder is adjudicated as bankrupt under the Federal Bankruptcy Code (voluntarily or involuntarily), or makes an assignment for the benefit of creditor, or files a petition seeking to force the involuntary winding up and dissolution of the Corporation under California Corporations Code Section 1800 or a successor provision, or if substantially all property of the Shareholder is levied on and sold in a judicial proceeding, the Corporation first, and then the other Shareholders shall have the option to purchase all, or any part, of the shares owned by the Shareholder and his or her spouse. Any Shareholder who has information that would reasonably cause the Shareholder to believe that his or her shares would be transferred involuntarily or by operation of law, or who files a petition seeking to force involuntary dissolution of the Corporation, shall give written notice to the Corporation and the other Shareholders in accordance with Section 19, (for purposes of this Section 5.A.(1), 'Offer Notice') and shall offer, or by such action shall be deemed to have offered, to sell his or her shares and any of his or her spouse's shares, at the price provided in Section 10 and upon the terms described in Section 11 of this Agreement. . . .

---

**3**    Section 13 of the Agreement, which related to "**Permitted Transfer**," was not relevant in the instant case.

"(2)     Unauthorized Encumbrance.  In the event any Shareholder encumbers, hypothecates, or pledges any shares in the Corporation, all of such Shareholder's shares in the Corporation shall be subject to the option to purchase described in this Section.  Any Shareholder who has encumbered, hypothecated, or pledged shares in the Corporation, shall give written notice to the Corporation and the other Shareholders in accordance with Section 19, (for purposes of this Section 5.A.(2), 'Offer Notice') and shall offer, or by such action shall be deemed to have offered, to sell his or her shares and any of his or her spouse's shares, at the price provided in Section 10 and upon the terms described in Section 11 of this Agreement. . . .

"(3)     Unauthorized Conveyance or Gift.  In the event any Shareholder assigns, conveys, or otherwise transfers any shares in the Corporation in violation of the terms of this Agreement, all of such Shareholder's shares in the Corporation shall be subject to the option to purchase described in this Section.  Any Shareholder who makes such an assignment, conveyance, or transfer of the shares in the Corporation, shall give written notice to the Corporation and the other Shareholders in accordance with Section 19, (for purposes of this Section 5.A.(3), 'Offer Notice') and shall offer, or by such action shall be deemed to have offered, to sell his or her shares and any of his or her spouse's shares, at the price provided in Section 10 and upon the terms described in Section 11 of this Agreement. . . .

"(4)     Death of Michael Harvey.  In the event of the death of MICHAEL HARVEY, if his interest in the Shares of the Corporation (whether held in the Harvey Trust or otherwise) is transferred to anyone other than his spouse or his then living issue (or the then living issue of his spouse), then all of the interest of MICHAEL HARVEY and the HARVEY TRUST in the Shares in the Corporation shall be subject to the option to purchase described in this Section.  On the death of MICHAEL HARVEY, if such death will result in the transfer of his interest in the Corporation to anyone other than his spouse or his then living issue or the living issue of his spouse, the HARVEY TRUST shall give written notice to the Corporation and the other Shareholders in accordance with Section 19, (for purposes of this Section 5.A.(4), 'Offer Notice') and shall offer, or by such action shall be deemed to have offered, to sell the shares and any of his or her spouse's shares, at the price provided in Section 10 and upon the terms described in Section 11 of this Agreement. . . .

"(5)     Termination of Employment of Archibald.  In the event MICHAEL ARCHIBALD is no longer employed by the Corporation

7.

(whether voluntarily by such employee Shareholder or because of termination by the Corporation with or without cause), the interest of the ARCHIBALD TRUST will be deemed, by the provision of or receipt of notice of termination by MICHAEL ARCHIBALD, as the case may be (for the purposes of this Section 6(vii), [*sic*] 'Offer Notice'), will be deemed to offer to sell its shares and any permissible transferees['] shares at the price provided in Section 10 and upon the terms described in Section 11 of this Agreement.  [¶] . . . [¶]

"**B.**     Corporation Option Period.  In the case of Triggering Event under this Section, the Corporation shall have an option for a period of the longer of:  (i) one hundred eighty (180) days following the date of the Triggering Event, or (ii) ninety (90) days following the final determination of value under Section 10 of this Agreement (for purposes of this Section 5.B. the 'Corporation Option Period'), to purchase all or any portion of the shares of the Shareholder who is subject of the Triggering Event and his spouse, at the price determined under Section 10 of this Agreement and the terms as set forth in Section 11 of this Agreement.  [¶] . . . [¶]

"**D.**     Shareholder's Option Period.  If the Corporation fails to exercise its option as to all of the offered shares within the Corporation Option Period, then for ninety (90) days following the expiration of the Corporation Option Period, the other Shareholders shall have the option to purchase all or any portion of the offered shares not purchased by the Corporation (for purposes of this Section 5.D. the 'Shareholder Option Period'), at the same price and terms as provided for the Corporation in Section 5.B. above.  [¶] . . . [¶]

"**Section 6.    Purchase Obligations On Death of Archibald.**  On the death of MICHAEL ARCHIBALD, the HARVEY TRUST and/or MICHAEL HARVEY shall acquire all of the outstanding Shares of the Corporation owned by the ARCHIBALD TRUST and/or his spouse and any transferee who received a transfer of Shares owned by MICHAEL ARCHIBALD or the ARCHIBALD TRUST after the date of this Agreement. . . .  The purchase price and terms of purchase shall be as specified in Section 10 and Section 11 of this Agreement.  [¶] . . . [¶]

"**Section 8.    Sale on Marital Dissolution or Separation of Shareholder.**

"**A.     Provisions For Divorce.**  For purposes of this Section 8, MICHAEL HARVEY shall be deemed to be the owner of the Shares owned by the Harvey Trust.

8.

"Any decree of dissolution, separation maintenance agreement, or property settlement between a Shareholder and his or her respective spouse shall include either of the following two (2) provisions:

"(1)    A provision that the Shareholder shall purchase from his or her respective spouse and the spouse shall sell to the Shareholder, upon the terms and conditions provided in this Section, every interest the spouse has in the Shareholders' shares in the Corporation; or

"(2)    A provision granting to the separated or divorced Shareholder, his or her respective spouse's (or former spouse's) entire interest in the shares of the Corporation as a part of the division of the community property of the marriage pursuant to the California Family Code.

"**B.     Option To Buy Spouse's Interest.**  If neither of the above provisions is included, and a decree of dissolution, a separate maintenance agreement, or a property settlement between Shareholder and his spouse grants the spouse shares in the [C]orporation, then the divorced or separated Shareholder shall be required to purchase from his spouse or ex-spouse ('spouse') and the spouse shall be obligated to sell, the shares of the Corporation granted to him pursuant to the decree of dissolution, separate maintenance agreement, or property settlement agreement at the price set forth in Section 10 and upon the terms and conditions set forth in Section 11 of this Agreement.  Such sale shall close within the later of sixty (60) days after the date of the decree of dissolution, separate maintenance agreement, or property agreement granting shares to the spouse is executed. If such sale does not close within that period, the divorced Shareholder shall provide notice of such failure to the Secretary of the Corporation and the other Shareholders.

"**C.     Effect of Failure To Purchase.**  If the Shareholder fails to purchase the shares from his or her spouse within the period specified in the foregoing subsection, first the Corporation and then the other Shareholders shall have the option to purchase any or all the shares of the divorced Shareholder and the shares of the spouse of the divorced Shareholder.  Such option shall be exercisable from the date notice of the existence of such option is received by the Corporation and the other Shareholders and in accordance with the price and terms set forth in Sections 10 and 11, and in the time periods and manner of exercise as set forth in Sections 5.B. through 5.G. of this Agreement with such notice constituting a 'Triggering Event.'

9.

"**Section 9.    Marriage of Shareholder.**  If any Shareholder, after the execution of this Agreement, becomes married, such Shareholder's spouse shall, within ninety (90) days of the date of marriage be provided a copy of this Agreement by such Shareholder, and shall sign a spousal consent . . . and shall deliver such consent to the Secretary of the Corporation.  If such consent is not received by the Corporation within such ninety (90) day period, such failure of receipt shall constitute an Offer Notice by the newly married Shareholder to the Corporation and the Corporation and other Shareholders shall have the option to purchase such Shareholder and his or her spouse's interest in the Corporation at the price and terms set forth in Sections 10 and 11, and in accordance with Sections 5.B. through 5.G. . . .

"**Section 10.  Valuation.**  The purchase price to be paid for the Shares which are subject to purchase shall be the fair market value of the interest in the Corporation which are represented by such Shares, all as determined under this paragraph.  For purposes of this paragraph, the fair market value of the interest in the Corporation which is subject to purchase shall be agreed on by the selling Shareholder or his or her successor in interest and the Corporation and remaining Shareholders within thirty (30) days of the event giving rise to the right to purchase (the 'Negotiation Period').  If the parties do not agree on a new value within the Negotiation Period, the value of the selling Shareholder's interest (and the value represented by the Shares which are subject to purchase) shall be determined by appraisal as follows:  The remaining Shareholder (on the one hand) and the selling Shareholder or his or her successor in interest shall each appoint an appraiser to appraise the Shares which are subject to purchase within fifteen (15) days after the expiration of the Negotiation Period.  If either party fails to select an appraiser within the time required by this Section, the fair market value of the Shares which are subject to purchase shall be conclusively deemed to equal the appraisal of the appraiser timely selected by the other.  The two appraisers as timely designated shall confer within five (5) days thereafter to designate and appoint a third appraiser who shall be the 'Final Arbitrator Of Value' if the same is required hereunder.  If two appraisers are properly appointed, they shall confer to agree on a value.  If the two appraisers cannot agree on a value within ninety (90) days after the expiration of the aforementioned ten (10) day period they shall each provide a written designation of their determination of value of the shares which are subject to purchase and the following provisions shall apply:

"(i)    if the difference between the lower determination of value and the higher determination of value by the two appointed appraisers is less than 15%, the average of the two appraisals shall be the final determination of value;

10.

"(ii)    if the difference between the lower determination of value and the higher determination of value by the [two appointed appraisers] is greater than 15%, the Final Arbitrator of Value shall determine which of the first two (2) appraiser[s] most closely approximates the actual value of the shares which are subject to purchase within fifteen (15) days thereafter based on the information provided by the two previous appraisers and whose determination as to the value of the shares which are subject to purchase shall be binding on all parties.  The Final Arbitrator of Value shall not have discretion to select a value other than one of the two values provided by the first two appraisals hereunder.

"The selling Shareholder and the Corporation shall share equally the fees and expenses of the appraiser jointly named by the parties, but each party shall be responsible for the fees and expenses of any appraiser named solely by that party.  Each party shall bear their own expenses in presenting evidence to the appraisers.  In determining the purchase price, the appraisers appointed under this Agreement shall consider all opinions and relevant evidence submitted to them by the parties, or otherwise obtained by them, may consider appropriate discounts or bonus values represented by the interests which are subject to purchase, and shall set forth their determination in writing together with their opinions and the considerations on which the opinions are based, with a signed counterpart to be delivered to each party.  Real estate and improvements shall be valued at fair market value, machinery and equipment shall be valued at replacement cost or at fair market value, whichever is lower; inventory shall be valued at cost or market, whichever is lower; receivables shall be valued at their face amount less an allowance for uncollectible items that is reasonable in view of the past experience of the Corporation and a recent review of their collectibility; all liabilities shall be deducted at their face value; and a reserve for contingent liabilities shall be established. Any appraisal hereunder shall be as of the last day of the month which is prior to the month in which the Triggering Event or other event giving rise to an option or mandatory obligation to purchase hereunder.  The appraiser shall use such appraisal standards as are customary for a business similar to the Corporation.

11.

"**Section 11.  <u>Payment and Transfer of Shares</u>.**

"**A.**    <u>Transfer</u>.

"(1)    The consideration to be paid for the shares subject to this Agreement shall be paid to the transferring Shareholder or such Shareholder's estate or spouse, as the case may be.  If the purchase is caused by death, the decedent's personal representative shall apply for and obtain any necessary court approval or confirmation for the sale of the decedent's shares as required.  In all events, consideration for the shares shall be delivered in accordance with the time periods specified in this Agreement to the persons entitled to it, and the person holding the certificates shall cause the certificates representing the shares to be properly endorsed and upon compliance with applicable law, shall issue new certificate(s) in the name of the purchaser or purchasers.  [¶] . . . [¶]

"**B.**    <u>Payment Terms</u>.

"(1)    The purchase price shall be paid, at the option of the purchaser, in the manner specified in the Offer Notice to the extent Section 5.A. is applicable, or in the case of a purchase under any other provision of this Agreement, by a promissory note executed by the purchasing party (executing separate notes if there is more than one) (the 'Note').  The Note shall:  (i) be a negotiable instrument; (ii) shall be all due and payable on the date which is fifteen (15) years after the consummation of the sale; (iii) shall bear interest at the greater of:  (a) _____ percent or (b) the lowest applicable federal rate such that no interest is imputed on such obligation; (iv) shall provide for fully amortized monthly installments of principal and interest calculated over a fifteen (15) year period, and (v) contain full privilege of prepayment of all or any part of the principal at any time without penalty or bonus.  All interest and principal payable under such Note will, at the option of the holder, be accelerated upon default.  The Note shall be secured by a pledge of all the shares being purchased in the transaction to which the note relates.  The pledgeholder shall be an independent third party designated by the purchaser and the pledge agreement shall contain such other terms and provisions as may be customary and reasonable. . . ."

## II.  Valuation

### a. *Michael Smith*

Smith, a forensic accountant, was hired by Michael to appraise the Harveys' joint ownership interest in Enviro Tech.  Smith concluded that the fair market value of Cynthia's one-half interest in the 825 jointly owned shares was $21,331,895.

At the outset of his calculation, Smith adjusted for Enviro Tech's $2,471,817 "deferred tax liability."  He testified:

> "It's a timing difference attributable to tax deductions that were taken primarily in the area of depreciation.  And so relative to the computation, basically you have this liability where you've really deferred it and it's going to be paid at the point in time that the depreciation basically reverses itself.  That's the way that I understand the deferred tax liability computation.  [¶] . . . [¶]  It is going to be [paid at] whatever the tax rates are when the reverse occurs.  [¶] . . . [¶]  . . . It's a deferred tax liability . . . .  It will be paid at some point in the future."

Later, Smith applied a "lack of marketability discount."  In his report, he explained:

> "A discount for lack of marketability is commonly applied to the ownership capital of closely held entities to reflect the lack of a recognized market for the ownership interests and to show that such interests are not readily transferable.  Investors typically prefer investments that have access to a liquid secondary market and can be readily converted into cash.  All other factors being equal, ownership interests without such marketability characteristics will sell at a discount when compared to interests that include such marketability features."

Smith also testified:

> "Basically, marketability considers the liquidity of the interest, how quickly and with certainty it can be converted to cash at the owner's discretion.  [¶] . . . [¶]  . . . In my office, when we undertake an appraisal of a closely held business, there basically are restrictions on the liquidity relative to that particular investment.  And so we go ahead and allow for that when the standard of value is fair market to value.  [¶] . . . [¶]
>
> ". . . If you have a small closely held business, it generally doesn't have the same liquidity of a stock in AT&T or something that's traded over and over in the market.  [¶] . . . [¶]  . . . [T]he liquidity has to do with the

13.

security itself . . . .  [¶] . . . [¶]  . . . Of the shares of common stock in the closely held business.  It has some liquidity restrictions because it's not as easy to convert that to cash.  [¶] . . . [¶]  . . . [I]f you can convert it to cash, then it's a liquid asset.  If you can't, then there's some liquidity restrictions.  [¶] . . . [¶]

". . . [Enviro Tech], by virtue of the fact that it's small and closely held, it has liquidity restrictions relative to something that's traded over and over in an open market.  And so that was the consideration that I factored into preparing a marketability discount."

Based on restricted stock studies, Smith arrived at a 22.72 percent discount for lack of marketability.

b.  *John Iacopi*

Iacopi, a forensic accountant, was hired by Cynthia "[t]o determine the fair market value of the shares of stock owned by [her]."  He concluded that the fair market value of Cynthia's one-half interest in the 825 jointly owned shares was $39,954,338, an amount that exceeded Smith's appraisal by $18,622,443.  While both Iacopi and Smith "followed the fair market value standard," Iacopi "didn't discount."  Regarding Enviro Tech's $2,471,817 deferred tax liability, he testified:

"[Smith and I] agreed on deferred income taxes, that they're not immediate and specific, but he allowed them to stand as . . . valid liabilities of the corporation, while I didn't."

As to why no lack-of-marketability discount was applied, Iacopi explained:

"Fair market value is a standard of value that I applied in my assignment.  And in this particular case, the difference between fair market value and pro rata value, I found to be one and the same because the buy-sell agreement between the parties, in fact, created a market for the shares, and we weren't dealing with a fair market value standard by definition, which encompasses the fact that the shares will be exposed to the open market, to a universe of buyers and sellers, not a particular buyer or seller, but to a universe, and we don't have that in this case.

"The shares aren't exposed to an open and free market.  The buyer of the shares is [Michael] Harvey.  So we have a specific buyer.

"And in this case, I determined that the fair market value and the fair value, also know as pro rata value, also known as marital value, . . . are one and the same in this particular case. It's not uncommon. What the difference is between fair market value per se and marital value or fair value or pro rata value is the discounting process, which I found not to apply because the shares aren't supposed [*sic*] to an open and free market. We have a particular buyer, not an unknown hypothetical buyer, which the fair market value mandates. [¶] . . . [¶]

". . . [T]he agreement created a ready market for the shares. . . . So in my opinion . . . a lack of market discount exists because it's a misnomer. We have our market. We don't need to speculate. The buy-sell agreement creates a market. There is your market. [¶] . . . [¶]

"I actually quote [Michael] Harvey in his deposition about how marketable this company is and I cover that and quote him in my report. The company is very marketable. Would he have to give a 23 percent discount to attract a buyer for this company? No. In my opinion, no. He's got buyers calling him all the time. Highly marketable."

c. *PricewaterhouseCoopers LLP*

Given the disparity between Smith's and Iacopi's appraisals, Michael and Cynthia hired the professional services firm PricewaterhouseCoopers LLP to "serve as the Final Arbitrator of Value, as defined in Section 10 of the . . . Agreement . . . ." After reviewing each expert's valuation reports, PricewaterhouseCoopers LLP concluded that Smith's opinion "most closely approximated the actual value of the shares which are subject to purchase (owned by Ms. Cynthia Harvey)."

d. *The court*

In its "**FINAL STATEMENT OF DECISION REGARDING PRINCIPAL CONTROVERTED ISSUES AT TRIAL**" filed on July 20, 2018, the court found that Smith's appraisal was "more persuasive," "compelling," "accurate," "reasonable," and "equitable" than Iacopi's.

15.

**III.     Post-separation acquisition of additional Enviro Tech shares**

Michael acquired a total of 115 additional Enviro Tech shares after he and Cynthia separated:  50 from Michael Archibald in 2012; five from Fernanda Cabral in 2015; and 60 from John Pray in 2017.

At trial, Michael testified that he used post-separation earnings to purchase Michael Archibald's and Cabral's shares.  Harvey Archibald Partners—a limited partnership that was awarded to Michael as his separate property pursuant to a November 2, 2015 stipulation,—purchased Pray's shares using proceeds of a December 23, 2015 loan secured by "Plant 6," a facility in Arkansas owned by Enviro Tech.  Michael explained that Harvey Archibald Partners owned real property, "lease[d] it back to Enviro Tech primarily," and "had been the landlord to Enviro Tech . . . for 10 or 11 years."  The limited partnership's revenue stream was "rental income" paid by Enviro Tech, which "was going to be the source of the funds to be [used] to repay the loan."  Michael did not notify Cynthia about the purchase of Cabral's shares but notified her about the purchases of Michael Archibald's and Pray's shares.

Cynthia testified that she did not receive any advance notice about Michael's purchases of Michael Archibald's and Pray's shares.

Iacopi testified that he and Smith "normalized" Michael's "alleged bad acts" as part of their valuations and these acts "did not impair [his] opinion of value of Enviro Tech . . . ."  (Boldface omitted.)

## DISCUSSION

**I.     Michael's appeal**

a. *Applicability of Section 11 of the Agreement*

i. Prior proceedings

On July 10, 2013, a bifurcated bench trial commenced on the issue of the Agreement's enforceability.  Michael and Cynthia stipulated that the Agreement advantaged Michael, raising a presumption that he exerted undue influence over her.  In a

16.

September 17, 2014 statement of decision, the superior court concluded that Michael rebutted the presumption of undue influence and upheld the Agreement. Thereafter, Cynthia filed a request for order (RFO)[4] seeking a ruling that her one-half interest in the jointly owned Enviro Tech shares would be appraised in accordance with the Family Code rather than the Agreement's Section 10 ("**Valuation**"). In an April 23, 2015 statement of decision, the court denied the RFO, finding that the Agreement's Section 8 ("**Sale on Marital Dissolution or Separation of Shareholder**") required the shares to be valued pursuant to Section 10. (*In re Marriage of Harvey* (Aug. 23, 2016, F070672, F071535) [nonpub. opn.] (*Harvey I*).)

On consolidated appeal from the interlocutory orders, Cynthia argued that the court erred by finding that Michael rebutted the presumption of undue influence and by denying her RFO, among other things. We affirmed the orders. As to Cynthia's first contention, we concluded that substantial evidence supported the finding that the presumption was rebutted. As to her second contention, we held:

> "Generally, an appellate court interprets a written instrument de novo. (*Rooney v. Vermont Investment Corp.* (1973) 10 Cal.3d 351, 372; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *In re Marriage of Kelkar* (2014) 229 Cal.App.4th 833, 845.)
>
> " 'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . .' (Civ. Code, § 1636; accord, *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).) 'When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .' (Civ. Code, § 1639; accord, *Waller*, *supra*, at p. 18.) 'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' (Civ. Code, § 1638; accord, *Waller*, *supra*, at p. 18.)

---

[4] In a family law proceeding, an RFO is the equivalent of a motion or notice of motion. (See Cal. Rules of Court, rule 5.92(a)(1)(A).)

17.

"In her RFO, Cynthia argued Section 8, subdivision A., is not subject to Section 10 at all and valuation must be 'in accordance with the Family Code.'

"Under subdivision A.(1) of Section 8, in the event of a divorce in which Michael is not granted Cynthia's interest in [Enviro Tech] shares as part of the decree of dissolution, separation maintenance agreement, or property settlement, the decree, agreement, or settlement must allow Michael to buy Cynthia's interest 'upon the terms and conditions provided in this Section . . . .' [Citation.] The phrase 'this Section' clearly refers to Section 8 in its entirety and is not susceptible to another interpretation. (See Civ. Code, § 1644 ['The words of a contract are to be understood in their ordinary and popular sense . . . .']; see also *Prudential Ins. Co. of America, Inc. v. Superior Court* (2002) 98 Cal.App.4th 585, 599; *Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 820 [court will not engage in strained or tortured interpretation of contractual language in order to fabricate an ambiguity where none exists].) Section 8, by way of subdivisions B. and C., specifies Cynthia's interest in [Enviro Tech] shares must be purchased 'at the price set forth in' or 'in accordance with the price and terms set forth in' Section 10. [Citation.] Section 10—titled "**Valuation**"—sets forth the mechanism by which to determine '[t]he purchase price to be paid for [Enviro Tech] Shares which are subject to purchase . . . .' [Citation.]

"Section 8, subdivision A.(1), by virtue of its 'terms and conditions provided in this Section' language, encompasses Section 10.

"Cynthia insists such an interpretation of Section 8, subdivision A.(1), would transform subdivision A.(2) into 'meaningless surplusage language.' It does not. Subdivision A.(2), which contains the distinctive phrase 'as a part of the division of the community property of the marriage pursuant to the . . . Family Code' [citation], applies in the event of a divorce in which Michael *is* granted Cynthia's interest in [Enviro Tech] shares as part of the division of the community property. Our interpretation of subdivision A.(1), which concerns a different scenario, does not render subdivision A.(2) extraneous." (*Harvey I*, *supra*, F070672, F071535.)

ii. Analysis

Michael argues that "the trial court was bound by the law of the case stated in *Harvey I* to follow the [Agreement] in providing for [his] purchase of Cynthia's shares." (Boldface & some capitalization omitted.) He specifies:

18.

"The promissory note and purchasing procedure the trial court ordered in no way resemble the purchase terms and procedures mandated by [the Agreement's] [S]ection 11.  The trial court did not follow the mandate of [S]ection 8.B. to provide for the purchase of Cynthia's interest in the shares 'upon the terms and conditions set forth in Section 11' or similar mandate of [S]ection 8.C. to provide for purchase of the shares 'in accordance with the price and terms set forth in Sections 10 and 11. . . .' [Citations.]

"In failing to order purchase on the terms provided in [S]ection 11, the trial court violated the law of the case that this Court established in *Harvey I*:  that the [Agreement] controls Michael's purchase of Cynthia's interest in [Enviro Tech] shares."

"The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . .' [Citations.]"  (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892-893; see *Beam v. Dugan* (1940) 37 Cal.App.2d 491, 496-497 ["It is settled law that constructions of written instruments are decisions upon questions of law and become the law of the case . . . ."].)

In *Harvey I*, we determined that the language of Section 8, subdivision A.(1)—which concerned the scenario "in which Michael is not granted Cynthia's interest in [Enviro Tech] shares as part of the decree of dissolution, separation maintenance agreement, or property settlement"—"encompasses Section 10" "by way of [Section 8,] subdivisions B. and C." (*Harvey I*, *supra*, F070672, F071535.)  As noted, subdivisions B. and C. of Section 8 referred to both the "price" set forth in Section 10 and the "terms" set forth in Section 11.  (See *ante*, at p. 9.)  Thus, while there was no express determination in *Harvey I* as to Section 11, by virtue of *Harvey I*'s rationale, Section 8, subdivision A.(1) necessarily encompassed Section 11 as well.  We also pointed out that our interpretation of Section 8, subdivision A.(1) "does not render" "extraneous" Section 8, subdivision A.(2), which concerned the scenario "in which Michael *is* granted Cynthia's interest in [Enviro Tech] shares as part of the division of the community

19.

property." (*Harvey I*, *supra*, F070672, F071535.) We highlighted as "distinctive" the phrase " 'as a part of the division of the community property of the marriage pursuant to the [California] Family Code.' " (*Ibid.*)

Here, the court awarded Michael "all right, title, and interest in and to [Cynthia's] 412.5 community property [Enviro Tech] shares . . . ." This is the scenario contemplated in Section 8, subdivision A.(2). On appeal, Michael essentially contends that *Harvey I* required the lower court to impose the terms and conditions set forth in Section 11 ("**Payment and Transfer of Shares**"). However, *Harvey I* never addressed whether Section 8, subdivision A.(2) encompassed Section 11. The law of the case doctrine "does not apply to points of law that might have been, but were not determined on the prior appeal." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 302.) We resolve that question now.

Again, generally, an appellate court interprets a written instrument de novo. (*Rooney v. Vermont Investment Corp.* (1973) 10 Cal.3d 351, 372; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *In re Marriage of Kelkar* (2014) 229 Cal.App.4th 833, 845.) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . ." (Civ. Code, § 1636; accord, *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." (Civ. Code, § 1639; accord, *Waller*, *supra*, at p. 18.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638; accord, *Waller*, *supra*, at p. 18.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641; accord, Code Civ. Proc., § 1858.) "This means that '[c]ourts must interpret contractual language in a manner which gives force and effect to every provision' [citation], and avoid constructions which would render any of its provisions or words

20.

'surplusage.' [Citation.] Put simply, '[a] contract term should not be construed to render some of its provisions meaningless or irrelevant.' [Citation.]" (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 688; accord, *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473.)

In addition to Section 8, subdivisions A.(1), B., and C., other provisions in the Agreement called for the application of Section 11 (in tandem with Section 10):

Under Section 4 ("**Option to Purchase**"), in the event the Harvey Trust or the Archibald Trust desires to "sell, transfer, assign, pledge, encumber, hypothecate, or in any way dispose of any of his or her shares . . . or any right or interest in them," Enviro Tech "shall have the option to purchase all or any portion of the offered shares, at either the price and terms stated in [that shareholder's] Offer Notice or *at a price determined under Section 10 of this Agreement and the terms set forth in Section 11 of this Agreement* as determined at the option of [Enviro Tech]." (See *ante*, at p. 5, italics added.) If Enviro Tech fails to exercise its option, then the other shareholder "shall have the option to purchase all or any portion of the offered shares not purchased by [Enviro Tech] . . . *at the same price and terms as provided to [Enviro Tech] above*, as elected by the purchasing Shareholder(s)." (See *ante*, at p. 6, italics added.)

Under Section 5 ("**Other Events Giving Rise To Option To Purchase**"), subdivision A., in the event a shareholder is subject to one of five enumerated "Triggering Events"—i.e., "Bankruptcy / Involuntary Dissolution," "Unauthorized Encumbrance," "Unauthorized Conveyance or Gift," "Death of Michael Harvey," "Termination of Employment of Archibald"—then that shareholder "shall offer" "to sell his or her shares and any of his or her spouse's shares, *at the price provided in Section 10 and upon the terms described in Section 11 of this Agreement*" or "will be deemed to offer to sell its shares and any permissible transferees['] shares *at the price provided in Section 10 and upon the terms described in Section 11 of this Agreement*." (See *ante*, at pp. 6-8, italics added.) Section 5, subdivision B. specifies that Enviro Tech "shall have

21.

an option" "to purchase all or any portion of the shares of the Shareholder who is subject of the Triggering Event and his spouse, *at a price determined under Section 10 of this Agreement and the terms as set forth in Section 11 of this Agreement*." (See *ante*, at p. 8, italics added.) If Enviro Tech fails to exercise its option, Section 5, subdivision D. specifies that the other shareholder "shall have the option to purchase all or any portion of the offered shares not purchased by [Enviro Tech], *at the same price and terms as provided for [Enviro Tech] in Section 5.B. above*." (See *ante*, at p. 8, italics added.)

Under Section 6 ("**Purchase Obligations On Death of Archibald**"), in the event of Michael Archibald's death, "the HARVEY TRUST and/or MICHAEL HARVEY shall acquire all of the outstanding Shares of the Corporation owned by the ARCHIBALD TRUST and/or his spouse" and "*[t]he purchase price and terms of purchase shall be as specified in Section 10 and Section 11 of this Agreement*." (See *ante*, at p. 8, italics added.)

Under Section 9 ("**Marriage of Shareholder**"), in the event a shareholder marries and his or her spouse does not sign and submit a spousal consent form in a timely fashion, "the Corporation and other Shareholders shall have the option to purchase [the newly married] Shareholder and his or her spouse's interest in the Corporation *at the price and terms set forth in Sections 10 and 11*, and in accordance with Sections 5.B. through 5.G. . . ." (See *ante*, at p. 10, italics added.)

Section 11 was clearly invoked in the aforementioned provisions. However, the same cannot be said of Section 8, subdivision A.(2) upon a plain reading of its language. It neither overtly raised Section 11 (unlike Section 4, subdivision B., Section 5, subdivisions A. and B., Section 6, Section 8, subdivisions B. and C., and Section 9) nor referred to another provision that—in turn—mentioned Section 11 (unlike Section 4, subdivision D., Section 5, subdivision D., and Section 8, subdivision A.(1)). Furthermore, we do not find this omission to be absurd. The provisions in the Agreement invoking Section 11 congruously involved purchases of a signatory's shares by Enviro

Tech or another signatory under certain circumstances. On the other hand, while Section 8 was titled "***Sale* on Marital Dissolution or Separation of Shareholder**" (italics added), subdivision A.(2) dealt with the conferral of the entirety of Cynthia's interest in the jointly owned Enviro Tech shares to Michael "as a part of the division of the community property of the marriage pursuant to the California Family Code," not its sale. (See *Smith v. Morton* (1972) 29 Cal.App.3d 616, 620 [" 'Although the description of an instrument by the parties may bear some weight on the question of its interpretation, the name by which the parties designate their contract is not determinative of its nature. . . . Reference must be had to the instrument itself, to a reading and consideration of all its terms, conditions, and covenants, to determine its true character."]; see also *d'Elia v. d'Elia* (1997) 58 Cal.App.4th 415, 425 ["[T]he division of a community estate is not a simplistic 'sale' of *individual* assets, asset by asset, but an equal division of the whole of a community *estate*."]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2021) ¶ 8:1035.1, pp. 8-361 to 8-362 ["The 'asset distribution' method (which may or may not include a 'cash-out' equalizing award) does not amount to a 'sale' of individual assets between the spouses. Rather, it is part and parcel of the overall net equal division of the *whole* of the community estate."][5].)

"A bedrock principle of contract law in California has always been that competent parties should have ' " 'the utmost liberty of contract' " ' to arrange their affairs according to their own judgment so long as they do not contravene positive law or public policy. [Citations.]" (*Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 164; see *Naify v. Pacific Indemnity Co.* (1938) 11 Cal.2d 5,

---

[5]     Hogoboom and King's treatise, though not binding (see *Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1086), nonetheless has been cited favorably by the California Supreme Court. (See, e.g., *In re Marriage of Green* (2013) 56 Cal.4th 1130, 1137-1138; *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 913; *In re Marriage of Oddino* (1997) 16 Cal.4th 67, 82, fn. 8, 84, 88.)

11 ["Parties are, within reason, free to contract as they please . . . ."].) Had the parties to the Agreement wanted Section 8, subdivision A.(2) to invoke Section 11, they could have easily included language to that effect (as they had for other provisions). That they chose not to do so signaled a contrary intent. (Cf. *Scher v. Burke* (2017) 3 Cal.5th 136, 144-145 ["As a general rule, when the Legislature uses a term in one provision of a statute but omits it from another . . . we generally presume that the Legislature did so deliberately, in order ' "to convey a different meaning." ' "].)

In his reply brief, Michael acknowledges that section 8, subdivision A.(2) "does not expressly require payment 'upon the terms and conditions provided in this section,' as does subdivision A(1)" and "does not provide for or govern the terms and conditions of the division, particularly when the court uses the cash-out method" (italics omitted). Nevertheless, he suggests that Section 8, subdivision A.(2) must be construed to trigger Section 11 to "carry out the manifest intent of the [Agreement]." We disagree. "When the language of a contract is clear and explicit and is reduced to writing, the language of the contract governs its interpretation, and the intention of the parties is to be ascertained from the writing alone [citations]." (*Crow v. P.E.G. Construction Co., Inc.* (1957) 156 Cal.App.2d 271, 277.) "[W]hen courts construe an instrument, a judge is 'not to insert what has been omitted, or to omit what has been inserted . . . .' " (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954; accord, Code Civ. Proc., § 1858; see *American-Hawaiian Steamship Co. v. Home Sav. and Loan Assn.* (1974) 38 Cal.App.3d 73, 82 ["Courts through the medium of construction may not put into contracts provisions that are not already there."].) We find that the plain wording of Section 8, subdivision A.(2) did not contemplate Section 11 and will not rewrite this provision to "insert . . . language which [Michael] now wishes were there." (*Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1486.) Therefore, the court was free to set its own terms and conditions for the equalization payment. (See *In re Marriage of*

*Bergman* (1985) 168 Cal.App.3d 742, 761 ["Courts have discretion to use promissory notes for relatively short periods at reasonable interest rates."].)

## II. Cynthia's cross-appeal

### a. *Valuation*

Cynthia makes two arguments regarding the valuation of her one-half interest in the jointly owned Enviro Tech shares. First, "the court erred in applying a discount for possible future taxes that were not immediate and specific." (Boldface & capitalization omitted.) Second, "the trial court improperly utilized a marketability discount in valuing [Enviro Tech]." (Boldface & capitalization omitted.)

### i. Standard of review

"Under [Family Code] section 2550, the court must divide the community estate of the parties equally. In this regard, the court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division." (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 631 (*Duncan*).) "Issues concerning the valuation and apportionment of community property are reviewed for abuse of discretion." (*In re Marriage of Finby* (2013) 222 Cal.App.4th 977, 984.) "Generally, 'the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered. [Citations.]' [Citation.]" (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.) "Insofar as the trial court made factual determinations—and the valuation of a business is a factual issue—we accept those facts as true so long as they are supported by substantial evidence." (*In re Marriage of Honer* (2015) 236 Cal.App.4th 687, 694 (*Honer*); see *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 [" 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value."].) "[A] court abuses its discretion if its findings are wholly unsupported, since a consideration of the evidence 'is essential to a proper exercise of judicial discretion.

[Citation.]' [Citation.]" (*In re Marriage of Ackerman*, *supra*, at p. 197.) "All issues of credibility are for the trier of fact, and all conflicts in the evidence must be resolved in support of the judgment." (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670.)

ii. Analysis

"Where economic circumstances warrant, the court may award an asset of the community estate to one party on such conditions as the court deems proper to effect a substantially equal division of the community estate." (Fam. Code, § 2601; see Cal. Law. Revision Com. com., 29D pt. 2 West's Ann. Fam. Code (2020 ed.) foll. § 2601, p. 17 ["Section 2601 continues former Civil Code Section 4800(b)(1) without substantive change."].) "Under this provision it is contemplated that where a major item of community property not reasonably subject to division is awarded one party, the other shall be compensated in some manner so as to maintain the required equal division." (*In re Marriage of Tammen* (1976) 63 Cal.App.3d 927, 930 [citing former Civ. Code, § 4800, subd. (b)(1)].)

"[T]he court possesses no authority to divide the community estate between the parties other than equally, and cannot delegate its responsibility to fix the fair market value of the community estate where assets are not divided in kind." (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 88; see Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:1328, pp. 8-474 to 8-475 ["Unless the parties stipulate or agree to accept some other measure of value (e.g., cost or book value), an equal division of the community estate must be predicated on *fair market value*."].) "[T]he fair market value of a marketable asset in marital dissolution cases is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no obligation or urgent necessity to do so, and a buyer, being ready, willing and able to buy but under no particular necessity for so doing." (*In re Marriage of Cream*, *supra*, at p. 89, fn. omitted; accord, Hogoboom & King, *supra*, ¶ 8:1329, p. 8-475; see *In re Marriage of*

26.

*Sharp* (1983) 143 Cal.App.3d 714, 719 [" 'Market value supplies a relatively objective and easily administered basis of valuation that no other method can supply.' "].)

" '[T]he determination of the value of infrequently sold, unlisted, closely held stock is a difficult legal problem.  Most of the cases illustrate there is no one applicable formula that may be properly applied to the myriad factual situations calling for a valuation of closely held stock.  [Citation.]  It is, therefore, incumbent upon a court faced with such a problem to review each factor that might have a bearing upon the worth of the corporation and hence upon the value of the shares.'  [Citation.]" (*Duncan*, *supra*, 90 Cal.App.4th at p. 632.)  "The value of property may be shown . . . by the opinions of . . . [¶] . . . [w]itnesses qualified to express such opinions."  (Evid. Code, § 813, subd. (a)(1).)

### 1.  Deferred tax liability

"[I]t is improper to take into consideration the tax consequences of an order dividing a community asset unless the tax liability is immediate and specific and will arise in connection with the division of the community property."  (*In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1315; accord, Hogoboom & King, Cal. Practice Guide:  Family Law, *supra*, ¶ 8:1356, p. 8-483.)  "The division of the community estate in a dissolution or legal separation proceeding is itself a non-recognizing event (neither spouse thereby incurs tax liabilities . . .).  And future tax consequences related to what either might eventually do with his or her share of the community estate are inherently speculative, controllable in large part by the taxpayer (e.g., he or she can decide whether and when to sell, can engage in tax planning to reduce the impact, etc.)."  (Hogoboom & King, *supra*, ¶ 8:1357, p. 8-483, italics omitted.)

In the process of reaching his final calculation, Smith accounted for Enviro Tech's $2,471,817 deferred tax liability.  According to his testimony, this liability—which related to depreciation—was "going to be paid at the point in time that the depreciation basically reverses itself," i.e., "at some point in the future."  "The mere possibility of taxation does not constitute a tax consequence sufficiently 'immediate and specific' to

merit judicial recognition in achieving an equal division of community property." (*In re Marriage of Davies* (1983) 143 Cal.App.3d 851, 857.)  Moreover, Iacopi testified that both he and Smith agreed that the deferred tax liability was "not immediate and specific."

Michael counters in his cross-respondent's brief that "the trial court did not err in . . . adjusting for deferred tax liability." (Boldface & capitalization omitted.)  However, this contention "is not fully developed and is not supported by citation to any authority." (*In re Marriage of Carlisle* (2021) 60 Cal.App.5th 244, 255.)  " 'An appellate brief "should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as [forfeited], and pass it without consideration." [Citation.]' " (*People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879, quoting *In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1164.)  We do so here.

We conclude that the valuation erroneously accounted for a tax liability that was not immediate and specific.

### 2.  Discount for lack of marketability

A discount for lack of marketability " 'adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation.' [Citation.]" (*Maughan v. Correia* (2012) 210 Cal.App.4th 507, 520; see *In re Marriage of Lotz* (1981) 120 Cal.App.3d 379, 384 ["The stock in a publicly traded corporation has liquidity value because its owners can sell stock and get money in a matter of days, whereas the stock in [a closely held corporation] has no liquidity value."].)

Here, both Smith and Iacopi appraised the fair market value of Cynthia's one-half interest in the jointly owned Enviro Tech shares, though the experts' calculations varied significantly.  Smith opined that a discount for lack of marketability was proper because Enviro Tech was a "small and closely held" entity that had "liquidity restrictions" compared to "something that's traded over and over in an open market" like AT&T.  His

report detailed that "[i]nvestors typically prefer investments that have access to a liquid secondary market and can be readily converted into cash." Iacopi believed that such a discount was a "misnomer" because (1) Michael would be a "specific buyer" of the jointly owned shares, which were not actually "exposed to an open and free market"; and (2) Enviro Tech was "[h]ighly marketable." The court adopted Smith's valuation, finding it "more persuasive," "compelling," "accurate," "reasonable," and "equitable." "Any substantial quarrel [Cynthia] may have with [Smith]'s valuation methodology goes to the weight . . . of his testimony." (*Honer*, *supra*, 236 Cal.App.4th at p. 699; see *Duncan*, *supra*, 90 Cal.App.4th at p. 632 ["Differences between the experts' opinions go to the weight of the evidence."].) "To the extent [Cynthia] suggests we reweigh the two expert opinions, she invites us to overstep the proper scope of our review." (*Honer*, *supra*, at p. 699; see *Robinson v. Wilson* (1974) 44 Cal.App.3d 92, 110 ["[T]he determination of the credibility and weight to be given to the testimony of experts is made 'by the trier of fact and not by an appellate tribunal.' "].)[6, 7]

We conclude substantial evidence supported a discount for lack of marketability.

---

[6] Cynthia asserts that Smith's trial testimony differed from his deposition testimony. Assuming, arguendo, this is true, "[i]nconsistencies only affect the credibility of the witness or reduce the weight of his testimony and it was for the trier of the fact to weigh the evidence and determine his credibility." (*Stromerson v. Averill* (1943) 22 Cal.2d 808, 814-815, overruled in part on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010.)

[7] Cynthia suggests that *Honer*, *supra*, 236 Cal.App.4th 687 stands for the proposition that a discount for lack of marketability is "rarely applied in a marital dissolution action." There is no such holding in that case. Cynthia also cites various other cases in an attempt to discredit the use of this discount. However, they are either factually inapposite or nonbinding out-of-state authorities. We once again reiterate that " 'there is no one applicable formula that may be properly applied to the myriad factual situations calling for a valuation of closely held stock. [Citation.]' " (*Duncan*, *supra*, 90 Cal.App.4th at p. 632.)

b. *Relief for breach of fiduciary duty*

      i.  <u>Background</u>

In a "**RESPONDENT'S REQUEST FOR STATEMENT OF DECISION**" dated May 22, 2018, Cynthia asked the court to "render a written statement of decision as to all contested factual and legal issues as set forth in her Post Trial Brief . . . filed concurrently herewith."  In the "**RESPONDENT'S <u>POST</u> TRIAL BRIEF**," she identified as a contested trial issue "Breaches of Fiduciary Duty by Mi[chael]," i.e., "Mi[chael's] Breach of His Fiduciary Obligation in the Acquisition of Additional [Enviro Tech] Shares Post-Separation (Archibald, Cabral, and Pray); Imposition of Constructive Trust."  Cynthia "request[ed] that Mi[chael] be deemed to have acquired the shares in trust for the benefit of the community, that they be awarded to him as community property at the same per share value as the 825 [jointly owned] shares, and that he may receive [Family Code section] 2640 reimbursements only to the extent that he proved that no community property or unauthorized funds from [Enviro Tech] were used to pay for the shares."

In the July 23, 2018 judgment, the superior court concluded that Cynthia "failed to establish any impairment of [her] undivided one-half interest in the community estate from any breach of fiduciary duty by [Michael]."  It explained in the July 20, 2018 statement of decision:

> "Here, the evidence adduced at trial failed to demonstrate that any of the alleged breaches resulted in harm to [Enviro Tech] or a significant diminution in its value.  None of the alleged breaches altered the opinions of either party's expert as to the value of [Enviro Tech] or the community's interest therein.
>
> "Somewhat perversely, it must be admitted, Husband's post-separation acquisition of [Enviro Tech] shares operated to consolidate ownership of the company in its founder and CEO, akin to a corporate 'buy-back' of voting rights stock with respect to dilution of control.  In any event, both experts were in agreement that the value of [Enviro Tech] increased substantially and consistently post-separation and it is therefore factually

30.

unsupported for Wife to contend that her community property interest in [Enviro Tech] was impaired by the stock purchases.

"Likewise, Husband's increases in income contrary to court orders and his, frankly, candid admission of what Husband refers to as 'bad acts' and what Wife refers to as 'money laundering' or 'round tripping,' as troubling as the Court finds them, are nevertheless not demonstrated by the evidence to have resulted in impairment of Wife's community interest in [Enviro Tech]."

Cynthia had filed a "**RESPONDENT'S OBJECTIONS AND REQUESTS AS TO THE STATEMENT OF DECISION AND PROPOSED JUDGMENT**" dated July 16, 2018. (Underlining omitted.) Regarding "**Husband's Breaches of Fiduciary Duties, Resulting Harm, and Available Remedy**," she stated:

"The Court seems to find that Husband breached his fiduciary duties owed to Wife in the management and control of their community property interest in [Enviro Tech]. However, the Court then holds that Wife failed to demonstrate that 'any of [the] alleged breaches resulted in harm to [Enviro Tech] or a significant diminution in its value' and also that Wife had failed to demonstrate that the alleged breaches 'impaired Wife's present undivided interest in the community estate.' Wife asserts that the Court has construed the 'harm' and 'remedy' prongs of the analysis too narrowly resulting in the Court declining to provide an appropriate remedy. The Court stated that Husband's conduct was very troubling, including his 'increase in income contrary to court orders,' 'candid admission of what Husband refers to as "bad acts," ' 'duplicitous acquisition of [Enviro Tech] stock from third-parties without notice to Wife,' and 'fraudulent procurement of money from [Enviro Tech] . . . [.]' Wife asserts that Husband's conduct, in each respect, was a breach of his fiduciary duties to Wife. At trial, Husband either admitted to his conduct and/or failed to controvert Wife's evidence as to his conduct."

ii. Analysis

"Under Family Code sections 721 and 1100, spouses have fiduciary duties to each other with respect to the management and control of community property." (*In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 992.) "A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including,

but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate." (Fam. Code, § 1101, subd. (a).)

Cynthia argues that "[t]he additional [Enviro Tech] shares were community property as to which Cynthia was provided no equalizing payment." (Boldface & some capitalization omitted.) She later adds:

> "[Family Code] Section 1101(a) refers to 'impairment to the claimant spouse's *present undivided one-half interest in the community estate*' (emphasis added), not to any specific community asset such as [Enviro Tech]. Cynthia's interest in the community property that Michael used to buy the additional shares was impaired when Michael used that property to benefit only himself."

In other words, Cynthia alleges that the court's ruling should have accounted for impairments to her undivided one-half interest in (1) the community property used to purchase the additional Enviro Tech shares; and (2) the additional Enviro Tech shares themselves. The statement of decision made no express findings as to whether (1) Michael used community property to purchase the additional shares; and (2) the additional Enviro Tech shares constituted community property.

"A party may . . . preserve perceived error in a statement of decision, by making specific objections to the statement of decision. Code of Civil Procedure sections 632 and 634 prescribe a two-step process for doing so. '[F]irst, a party must request a statement of decision as to specific issues . . . ; second, if the court issues such a statement, a party claiming deficiencies therein must bring such defects to the trial court's attention to avoid implied findings on appeal favorable to the judgment . . . .' " (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94, quoting *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134.) "To bring defects in a statement of decision to the trial court's attention within the meaning of [Code of Civil Procedure] section 634, objections

to a statement of decision must be 'specific.' [Citation.] The alleged omission or ambiguity must be identified with sufficient particularity to allow the trial court to correct the defect. [Citation.] 'By filing specific objections to the court's statement of decision a party pinpoints alleged deficiencies in the statement and allows the court to focus on the facts or issues the party contends were not resolved or whose resolution is ambiguous.' [Citation.]" (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 498.)

Here, Cynthia's objections to the statement of decision did not identify with sufficient particularity any lack of findings as to Michael's use of community property to purchase the additional Enviro Tech shares or the characterization of these shares as community property. "If the party challenging the statement of decision fails to bring omissions or ambiguities in it to the trial court's attention, then, under Code of Civil Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 59-60; see *id.* at p. 58 ["The doctrine [of implied findings] is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error."].)

" 'Under the doctrine of "implied findings," . . . appellate courts reviewing the appealed judgment must presume the trial court made all factual findings necessary to support the judgment for which there is substantial evidence.' [Citations.]" (*In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1248; see *Roddenberry v. Roddenberry*, *supra*, 44 Cal.App.4th at p. 651 [" 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value."].)

### 1. Purchase of Michael Archibald's and Cabral's shares

Michael testified that he purchased Michael Archibald's and Cabral's shares with post-separation earnings. (See Fam. Code, §§ 771, subd. (a) ["The earnings and accumulations of a spouse . . . , after the date of separation of the spouses, are the separate property of the spouse."]; 772 ["After entry of a judgment of legal separation of the parties, the earnings or accumulations of each party are the separate property of the party acquiring the earnings or accumulations."]; see also Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:70, p. 8-26 ["A community property interest may only be acquired *during marriage* and *before separation*."].) "The testimony of a single witness, even if that witness is a party to the case, may constitute substantial evidence." (*Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201, citing *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) We conclude that substantial evidence supported the implied finding that Michael did not use community property to purchase Michael Archibald's and Cabral's Enviro Tech shares.

"Property purchased with separate property funds is . . . the separate property of the acquiring spouse." (*In re Marriage of Stoner* (1983) 147 Cal.App.3d 858, 862, citing *In re Marriage of Mix*, *supra*, 14 Cal.3d at p. 610.) In view of Michael's testimony, we conclude that substantial evidence supported the implied finding that the Enviro Tech shares purchased from Michael Archibald and Cabral did not constitute community property.

### 2. Purchase of Pray's shares

Michael testified that Harvey Archibald Partners, a limited partnership awarded to him as his separate property pursuant to a November 2, 2015 stipulation, purchased Pray's shares using proceeds of a secured loan. "[I]f community assets are hypothecated to obtain the loan, the proceeds may be community property." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:281, p. 8-110.) In the instant case, however, the collateral was a facility in Arkansas owned by Enviro Tech. (See *Union Bank v.*

*Anderson* (1991) 232 Cal.App.3d 941, 949 ["When shareholders purchase stock in a corporation, and the corporation includes certain holdings in real property, the shareholders do not acquire an ownership interest in the real property. A share is simply a unit of proprietary interest which the shareholder holds in the corporation. [Citations.] That is, the shareholders are *not* the owners of corporate property; the whole title is in the corporation."].) We conclude that substantial evidence supported the implied finding that Michael did not use community property to purchase Pray's Enviro Tech shares.

"[T]he proceeds of a postseparation loan will be the separate property of the borrowing spouse if it is not obtained in exchange for community property and is, therefore, unrelated to the community." (*In re Marriage of Stephenson* (1984) 162 Cal.App.3d 1057, 1085; accord, Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:282, p. 8-110.) In view of Michael's testimony (see *Consolidated Irrigation Dist. v. City of Selma*, *supra*, 204 Cal.App.4th at p. 201), we conclude that substantial evidence supported the implied finding that the Enviro Tech shares purchased from Pray did not constitute community property.[8]

---

[8]     Cynthia filed a motion for judicial notice on October 23, 2019. We deferred our ruling pending consideration of the appeal on its merit. Now having done so, we deny Cynthia's motion.

## **DISPOSITION**

The judgment is reversed in part and the cause is remanded to the superior court to reevaluate Cynthia's one-half interest in the jointly owned Enviro Tech shares without consideration of the company's deferred tax liability and readjust the division of community property accordingly. (See *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 751-752.) Costs on appeal are awarded to Cynthia M. Harvey.


DETJEN, Acting P. J.

WE CONCUR:


FRANSON, J.


SMITH, J.